The UNITED STATES of America

v.

Sheldon WHEELER and William McGowan.

Nos. 11156–11157.

United States Court of Appeals,
Seventh Circuit.

Jan. 25, 1955.

Rehearing Denied March 16, 1955.

Jerome Berkson, Maurice A. Winkler, Gerald Wiley, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Anna R. Lavin, John Peter Lulinski, Asst. U. S. Attys., Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

DUFFY, Chief Judge.

In Counts 2, 3, 4 and 5 of the indictment defendants Wheeler and McGowan were each charged with violating the Dyer Act, 18 U.S.C.A. § 2311 et seq., in that each of them transported or caused to be transported in interstate commerce an automobile described in the indictment, knowing the same to have been stolen. Count 6 charged a conspiracy to violate the same statute. Count 2 charged the transportation of a stolen 1950 Chrysler from Chicago to Austin, Minnesota; Count 3, the transportation of a stolen 1950 Pontiac from Chicago to Austin, Minnesota; Count 4, the same offense as to a 1950 DeSoto from Chicago to Mason City, Iowa; Count 5 was dismissed on motion of the government. The jury found each defendant guilty as charged and each was sentenced to imprisonment for 5 years and to pay a fine of $5,000.

The sentence imposed upon the jury verdict of guilty was such that if the evidence is sufficient to sustain the conviction on any one count, the judgment of conviction herein must be sustained, Butler v. United States, 7 Cir., 138 F.2d 977, 981; United States v. Kelley, 7 Cir., 186 F.2d 598, 602, assuming, of course,

that the defendants had a fair trial, free from prejudicial error. We shall, therefore, first consider the proof as to Count 2 which refers to the 1950 Chrysler.

Sidney Peven, son of Joe Peven, testified that his father's 1950 four door Chrysler automobile, Motor No. C–4831-166, had disappeared from in front of their home in Chicago on September 20, 1950, and that neither he nor his father had given anyone permission to take or use the automobile.

Witness Harkness also testified with reference to the 1950 Chrysler, and his testimony is vigorously assailed by each defendant. They claim that Harkness testified as an expert witness, but had shown no qualifications therefor. Undoubtedly, his testimony was damaging to each defendant. For more than thirty years Harkness has been a special agent for the National Automobile Theft Bureau. He explained that the Theft Bureau maintained records of practically every automobile reported stolen in the United States, and that his job was to assist law enforcement officers in identification of stolen automobiles where the identification numbers had been altered. Over repeated objections he explained that automobile manufacturers stamp motor and serial numbers in locations in each automobile which are well known, but that they also stamp the same number in each automobile in a secret location so that if the original public numbers are eliminated or changed the automobile can still be identified by him or members of the FBI who know the locations of the secret numbers. He further testified that after a manufacturer once uses a certain number for identification on an automobile, the same number is not again used. Harkness then testified that the 1950 Chrysler described in Count 2 had been examined by him at Brainerd, Minnesota; that the public numbers had been filed off and a new number C–4861744 had been substituted; that his examination showed the secret number was C–4833166 which was proved to be the identifying number of the 1950

Chrysler which had been owned by Joe Peven of Chicago.

All of the foregoing testimony was clearly relevant and admissible and objections thereto were properly overruled. But, say defendants, some of Harkness' expert testimony indicated that the defendants were guilty of the offenses charged. To illustrate, Harkness was asked: "Why would anyone want to disguise the identification of an automobile?" and he answered: "Because if it was a stolen automobile, they would have to change the number in order to get it registered so that they could sell it." Defendants insist that by the use of the word "they" Harkness implied that the two defendants in the case at bar had made the changes in the identification of the numbers of the automobiles described in the indictment. We think the objection is far-fetched and without merit.

Leo Reddington, bookkeeper of B & J Motors, Beloit, Wisconsin, was shown an application for a State of Wisconsin Motor Vehicle Registration dated September 5, 1950 which showed B & J Motors as the seller and one Donald Carter as the purchaser of a 1950 four door Chrysler. The motor number stated on the application was C–4861744. Reddington testified the records of B & J Motors did not disclose the sale of an automobile of that description to Donald Carter or anyone else, and further, that he could not recognize the purported signature of the seller.

The proof further disclosed that Orville Millenacker purchased a 1950 four door Chrysler, Motor No. C–4861744, from the defendant McGowan to whom he paid cash in the sum of $500 and turned over a check for $1300 payable to Shelly Motor Co. Proof further showed that defendant Wheeler endorsed the $1300 check. Defendant's own proof showed that defendant Wheeler owned a used car business operated under the name of Shelly Motor Co., and that defendant McGowan operated same for him on a commission basis.

Because the evidence clearly supports the judgment of conviction on Count 2, detailed evidence need not be stated as to the proofs supporting Count 3 (1950 Pontiac) and Count 4 (1950 DeSoto). Suffice to say, in each case it was proved that the described automobiles were stolen, and that the public numbers had been changed. Proof was then made as to the secret number of each automobile, that sales thereof were made by the defendant McGowan in Minnesota and in Iowa, that checks were taken by McGowan payable to Shelly Motor Co. or Shelly Auto Co., and that said checks were cleared in due course through the banks.

As to Count 6, the conspirary charge, it is sufficient to point out that Wheeler testified that he and McGowan were associated in the purchase and sale of the three automobiles described in the indictment, each of which the government proved was stolen, and shortly thereafter said automobiles turned up in Minnesota and Iowa in the possession of the defendant McGowan.

■■ We think the evidence clearly supports the jury's finding of guilt as to each defendant on Counts 2, 3, 4 and 6. We proceed, therefore, to consider the alleged errors. As we have heretofore discussed the testimony of Harkness, no further reference thereto need be made.

We have considered the claims of the defendants that error was committed because of the receipt of incompetent and prejudicial evidence. The principal objection in this category is with reference to the testimony of Leo Reddington and C. William Bladon. Reddington, the bookkeeper of B & J Motors, testified that B & J Motors did not sell a 1950 Chrysler described in the indictment to one Donald Carter. Bladon, the proprietor of Bladon Motors, testified that his Company did not sell a 1950 Pontiac described in the indictment to any one. Bladon also testified that the purported signature on the application for Wisconsin Motor Vehicle Registration under the typewritten words "Bladon Motors" was not the signature of anyone working for him, and that there was no such person as "J. Bladon, Jr.", which name appeared on the registration application.

■ Defendants contend that neither Reddington's nor Bladon's testimony should have been received because the books and the records of each company were the best evidence as to whether such sales had been made. This objection clearly has no merit as to Bladon's testimony. While he admitted, on cross examination, that he had examined the books and records of his Company about a week before the trial, he positively stated on the stand that he was testifying from his own knowledge.

■ The following appears in Reddington's testimony: "Q. Did the B & J Motors ever sell a Chrysler of that serial number to Donald Carter? A. No, sir. Q. Did they sell a Chrysler of that serial number to anyone? A. No, sir." True, Reddington testified that he had looked over the inventory cards of B & J Motors about one week previous to the date of the trial and, undoubtedly, such examination re-assured his understanding and refreshed his memory that a sale of the Chrysler described in the indictment had not been made to the fictitious person, Donald Carter, on or about September 5, 1950. No demand or request was made for the production of the inventory cards. Upon request the District Court would, undoubtedly, have required their production. The best evidence rule has some limitations. The original document is, of course, the best evidence of its contents, but what is the best evidence of the non-existence of a document? We do not think there was error in admitting Reddington's testimony, certainly no prejudicial error.

■ We also hold there was no undue restriction upon defendants' right to cross examine government witnesses. The extent of such cross examination is in the discretion of the trial judge. We will review only to determine wheth-

er there has been an abuse of discretion. We find no such abuse here.

However, we must discuss briefly the claim of the defendants that sarcastic and prejudicial remarks of the trial judge made in the presence of the jury deprived the defendants of a fair and impartial trial.

Each defendant was represented at the trial by his own attorney. It would seem that there was no occasion for the trial judge to be confused as to which attorney represented each defendant. However, on a number of occasions the trial judge interrupted McGowan's attorney asking which defendant he represented. The defendants claim that such remarks were extremely damaging to them especially upon the charge of conspiracy, that the court implied that defendants were operating in concert, even in the court room to such an extent that the Judge could not tell which attorney was representing each defendant.

When witness Kessler was on the stand, Wheeler's attorney asked whether he had ever seen Wheeler before the trial. The government objected and the court said (R. 25) "Sustained. That is the sort of thing you did not want to go into, Mr. Berkson. If you want to keep it brief, we will keep it brief for you. We will narrow the issues."

Defendant Wheeler contends that this remark was sarcastic, uncalled for and prejudicial, especially in view of the fact that nowhere previously had Mr. Berkson requested that the trial be kept brief. Each defendant claimed it showed another instance of the trial judge's hostility toward the defendants.

Attorney Berkson had finished reading a number of questions and answers from a deposition preparatory to asking a witness whether those questions had been asked of him, and whether he had made those answers. The government objected, and the trial judge said: "I was waiting for the objection. I will sustain the objection." Counsel for Wheeler summarizes his claim of error due to the conduct of the trial judge by saying: "In many instances throughout the record the trial judge exhibited evidence of hostility and antagonism toward counsel for the defendants. By comparison, the court's attitude to counsel for the government was one of overwhelming approval of everything he did, even to the extent of putting words into his mouth, giving him reasons to assign and even helping out the government's witnesses by stating what the court believed the witness meant in cases where the answers of the witness were confusing."

It is, of course, the duty of the trial judge to endeavor to maintain throughout the trial an atmosphere of impartiality, and to conduct the trial in an orderly way with a view of eliciting the truth and of attaining justice between the parties.

We think it was error to volunteer the statement in the presence of the jury that the objection which the government finally made was the one the trial judge had been waiting for, and he apparently sustained the objection with considerable vigor and enthusiasm. We think it appropriate to repeat what we said in United States v. Levi, 7 Cir., 177 F.2d 833, 836: "The influence of the trial judge on the jury is necessarily and properly of great weight, Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841, and jurors are ever watchful of the words which fall from him. 'The judge occupies a position of great influence with the jury in conducting a trial; * * * he should be careful not * * * to say anything which might have the effect of prejudicing the cause of either party before those whose duty it is to decide on the facts.' Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 405 [4 A.L.R.2d 1064]."

We recognize that a judge conducting a jury trial in the Federal Court is not a mere moderator, Quercia v. United States, 289 U.S. 466, 469, 53

S.Ct. 698, 77 L.Ed. 1321, and appellate courts must guard against the magnification on appeal of instances which were of little importance in their setting. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680. We have concluded that in view of the great weight of the evidence in the case at bar pointing to the guilt of each defendant, that the errors were harmless in this case and that judgment of conviction should be

Affirmed.

FINNEGAN, Circuit Judge (concurring).

Since these convictions rest squarely upon substantial evidence, United States v. Thayer, 7 Cir., 1954, 209 F.2d 534, traced in a record free of reversible error, I approve this affirmance. I would add, however, some comments because of certain overtones implicit in the transcript.

According to common experience few shafts strike deeper into jurors' minds, during trial, than words spoken by the presiding judge. It is also perfectly clear that the practical repercussions of his various utterances cannot always be clearly traced to and through jury verdicts. Yet trial judges possess such flexibility as may be necessary for properly performing their functions. The core problem of a trial judge lies in striking and maintaining that delicate balance between himself and the triers of fact. Since the metes and bounds of judicial conduct, during a trial by jury, are difficult to delineate, much less to reduce to a concise simple formula, I think it is worth underscoring some of its aspects when appropriate instances arise.

Here, the district judge's remarks were more impertinent, than prejudicial. I am satisfied that no impingement on the defendants' rights resulted from the judge's unsuitable phraseology. When a trial judge assumes the role of a caustic critic he skirts the border of partisan participation.

SCHNACKENBERG, Circuit Judge (concurring).

I believe the District Court committed errors in permitting government witnesses Reddington and Bladon to give certain material testimony on direct examination, over objection, inasmuch as it appeared that such testimony was based upon what they had learned from examining certain records. The records were not introduced into evidence nor was there any showing that they were unavailable. The records were the best evidence and the testimony of the witnesses was secondary evidence. The government showed no reason for the non-production of the best evidence.

However, in view of the other evidence in the record showing the guilt of the defendants, these errors were not prejudicial and do not require a new trial.