**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Samuel A. CARMEL, Defendant-Appellant.**

**No. 12534.**

United States Court of Appeals
Seventh Circuit.

June 5, 1959.

Myer H. Gladstone, Leo J. Spivack, Chicago, Ill., for defendant-appellant.

Robert Tieken, U. S. Atty., James D. Montgomery, Asst. U. S. Atty., Chicago, Ill., for appellee.

John Peter Lulinski, Asst. U. S. Atty., Chicago Ill., of counsel, for plaintiff-appellee.

Before DUFFY, Chief Judge, and SCHNACKENBERG and HASTINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Samuel A. Carmel, defendant, appeals from a judgment of conviction based upon a jury's verdict finding him guilty, as charged in an indictment, counts I and II of which alleged that he and co-defendant Newton Elmo Renfro transported two automobiles from St. Louis, Missouri to Chicago, Illinois, knowing the same to have been stolen, and count III of which alleged a conspiracy between the same parties to commit the aforesaid offenses.

Renfro pleaded guity to each count and testified for the government on the trial of defendant.

It is defendant's contention that there is no evidence in the record which proves his guilt beyond a reasonable doubt. More specifically, defendant states that the government had the burden of proving that defendant had knowledge that the automobiles described in the indictment had been stolen. The government concedes that there is no direct evidence in the record of defendant's guilty knowledge but avers that knowledge may be established by circumstantial evidence.

We have carefully examined the record. There is evidence tending to prove, *inter alia*, that on August 6, 1958, Renfro asked Carmel, in St. Louis, if he knew where Renfro could sell a couple of cars in Chicago and that Carmel later gave Renfro the name of a Mr. Wormser, manager of Friendly Motors on Cicero avenue, in Chicago, and told Renfro that he wanted to get $400 out of the deal, to cover a debt which Renfro owed to him. Renfro agreed to that request. Renfro told Carmel that he was going to sell the cars in the name of Elmer Johnson who, Renfro said he told Carmel, was a dealer. Carmel telephoned Wormser and told him that a friend had two automobiles in St. Louis and this friend owed him some money, that the used car market there was very low, and asked Wormser if he could sell the cars for him in Chicago. Wormser agreed to see what he could do. The next day Carmel phoned Wormser and said that Elmer

Johnson would bring the cars in, that he owed Carmel some money and that if Wormser sold the cars, Wormser was to send him a check for $400.

Renfro came with the cars to Wormser in Chicago, representing himself to be Elmer Johnson. Renfro sold them to Wormser for $2,600 and, after getting Carmel's consent on the telephone, Wormser postdated a check which he gave to Renfro so as to gain time to check the titles to the cars, and agreed to mail to Carmel his check for $400.

Wormser contacted the Chicago police, who discovered that the cars had been stolen, and Wormser telephoned Carmel and told him so.

When Carmel was arrested in St. Louis, he insisted that a wreck rebuilder in St. Louis county, known to him as Elmer Johnson, owed him $400 from past dealings and that Elmer Johnson told him that he had two cars he wished to sell and had asked Carmel's assistance in selling them: that to help Johnson sell these cars he had telephoned to an old acquaintance, Wormser, in Chicago, where market conditions for cars were good.

Whether the evidence, as above briefly summarized,[1] established knowledge on the part of Carmel that the cars were stolen or a mere suspicion thereof, or neither knowledge nor suspicion, presents a serious question. We are convinced that all of the evidence in the record presented a close case to the jury for decision. Therefore Carmel's contention that prejudicial error in the course of the trial substantially affected the fairness thereof requires our consideration. Our attention is called to repeated questioning of witnesses and comments by the court, some of which we now cite.[2]

Renfro, a government witness, testified that he received from Wormser's firm, two checks payable to Elmer Johnson.

The following proceedings then took place:

"The Court: Who is Elmer Johnson?

"The Witness: No one in particular, sir.

"The Court: Why did you write his name on the check?

"The Witness: I know a dealer by the name of Johnson in St. Louis.

"The Court: You were using his name, is that it?

"The Witness: Yes, sir.

\* \* \* \* \* \*

"The Court: Did he have any interest in these cars, this Johnson?

"The Witness: No, sir, he did not."

When Renfro was cross-examined by defendant's attorney as to whether either Renfro and his partner, or the Donaldson Garage, owed about $600, the following proceedings occurred:

"The Court: Whom did you owe the money to?

"The Witness: Delta Underwriters.

"The Court: You didn't owe it to Mr. Carmel, did you?

"The Witness: Not to him personally.

"The Court: Not personally?

"The Witness: No.

"The Court: You owed it to your employer, isn't that right?

"The Witness: Right. It was to the company."

When Carmel testified to a conversation with Dempsey, an FBI agent, and referred to Renfro as Mr. Johnson, the court inquired:

"Why did you describe Mr. Renfro when he asked you about Mr. Johnson?"

The following then occurred:

"The Witness: Your Honor, I didn't know. All I knew was that an employee, a former employee of

---

1. We have not referred to some evidence favorable to Carmel.

2. To limit the length of this opinion, we do not allude to other interrogations by the court.

**348**

mine, a man that I had trusted, seemed somehow or other to have involved the company, the Reserve Insurance Company, in some sort of a problem, and, I mean, I—listen, it is not common practice—

"The Court: I don't want to listen.

"The Witness: —for the F.B.I. to come to my home.

"The Court: I just asked you a simple question, why did you describe Renfro when you were telling the representative of the Federal Bureau of Investigation about a man named Johnson? Just tell the jury that, please.

"The Witness: I had known that Mr. Johnson was the name that Mr. Renfro had used in Chicago."

When Carmel testified that he did not become suspicious of the transaction when Renfro told him he was going to use the name of Johnson in selling the cars, because at auctions many times an individual would sell cars through a dealer, it not being an uncommon practice, the following proceedings occurred:

"The Court: Is it common for a man to represent himself by a different name?

"The Witness: You will find that many dealers various times buy cars under various names so that they won't charge the auction price, that they are hungry for automobiles.

"The Court: Is it customary for a man to go into a prospective purchaser and say 'My name is Johnson' when he is someone else?

"The Witness: If he doesn't have a permit, your Honor, and in this case he did not have an automobile dealer's license.

"The Court: It is customary to do that in your industry, is it?

"The Witness: It is not uncustomary; it is not uncommon, sir."

Later, during the examination of Carmel, the following proceedings took place:

"The Court: Didn't it occur to you that a man—didn't it seem strange to you that a man who was earning $300.00 a month owned two automobiles that he wanted to sell?

"The Witness: Well, to give you another example, he had—

"The Court: I don't want an example, I want to know—

"The Witness: No, sir, because he had just received a draft from me for almost $400.00 some odd dollars for repairing of one Corvetta that I know he did himself.

"The Court: You think he could have bought two—

"The Witness: He could have bought them, he could have gotten an option on them. I don't know, sir."

Also the court conducted the following examination of Carmel:

"The Court: When payments were made to your employer, were those payments—did you ask the debtors ordinarily to make out checks to you personally?

"The Witness: Many, many times.

"The Court: Did you ask them to make out checks to you personally?

"The Witness: Yes.

"The Court: Or to some other man,—for example, a man like Johnson rather than to your employer?

"The Witness: What do you mean?

"The Court: I mean just that. If somebody owed your company money, did you say 'Make it out to a man named Johnson or make it out to yourself'?

"The Witness: I presume that you are referring to these checks.

"The Court: No. I am referring to the one check.

"The Witness: The one check for $400?

"The Court: Yes.

"The Witness: I asked that the check be made out to me.

"The Court: It was made out to Mr. Johnson, though, wasn't it?

"The Witness: This I never knew. I asked the check to be specifically made out to me.

"The Court: To you personally?

"The Witness: Yes.

"The Court: But it was money owing your company?

"The Witness: Yes."

When Andrew J. Horwitz, a witness for defendant, testified that he had met the owner of the Donaldson Court Garage only once or twice and that his memory for names was not the best, the court examined him as follows:

"The Court: Then you don't know, is that it? Do you know?

"The Witness: I do know one.

"The Court: Let's have the one.

"The Witness: Elmo Renfro was one of the principals along with some partners.

"The Court: He was a partner, all right."

The Court also conducted the following examination of Horwitz with respect to the compensation of Carmel:

"The Court: Was he allowed to take the money and put it in his own account before it was deposited in the company account?

"The Witness: Well, the issue never came up, your Honor, but Mr. Carmel had control of the funds in the office. Theoretically, when received, they should within a reasonable time.

"The Court: Under what style do you do business, as a corporation?

"The Witness: Jeffco was a corporation, yes.

"The Court: And do you say to me as head of that corporation that this employee, regardless of what his compensation was or how it was computed, could take payments which were made to your company and have a check made out to himself rather than to the company?

"The Witness: Well, in the practice of insurance, your Honor, it is very common that people make checks payable to the person who is the head of a particular insurance office. For instance, many payments I receive in Chicago will be made payable to me or Casualty Insurance Company. This is not uncommon.

\* \* \* \* \* \*

"The Court: \* \* \* Did you authorize that kind of a transaction?

"The Witness: Your Honor, you are putting me in a spot, 'that kind of a transaction.'

"The Court: I don't want to put you in a spot; all I want is a truthful answer to a question.

"The Witness: I don't know what you mean by that kind of a transaction. I did not authorize any automobile dealer to make a check out to anyone, that I can tell you.

"The Court: That is all I want to know."

After Horwitz testified to Carmel's reputation, honesty, truthfulness and veracity, the following examination took place.

"The Court: How long have you worked with him?

"The Witness: A little over a year.

"The Court: When did he discontinue his association with you?

"The Witness: August of this year.

"The Court: Was that a voluntary resignation?

"The Witness: No, sir.

"The Court: Or did you discharge him?

"The Witness: It was by mutual consent."

■ We recently said, in United States v. Scott, 7 Cir., 257 F.2d 374, 377:

"The influence of the trial judge on the jury is necessarily and properly of great weight, Starr v. United States, 1894, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841, and he should not say anything which might have the effect of prejudicing the cause of either party before those whose duty it is to decide on the facts. United States v. Levi, 7 Cir., 1949, 177 F.2d 833. It is the duty of the trial judge to endeavor to maintain throughout the trial an atmosphere of impartiality. United States v. Wheeler, 7 Cir., 1955, 219 F.2d 773. * * * "

In Gomila v. United States, 5 Cir., 146 F.2d 372, 373, the court said:

"This brings us to the third assignment of error, namely, undue participation of the court in the trial. A fair and impartial trial is guaranteed to every defendant, and fundamentally means a trial before an impartial judge and by an impartial jury. In aid of truth and in furtherance of justice, the court may question a witness,—in fact, he may call and question a witness not used by either party,—but in so doing the court should be careful to preserve an attitude of impartiality and guard against giving the jury any impression that the court was of the opinion that defendant was guilty. The opinion of the judge, on account of his position and the respect and confidence reposed in him and in his learning and assumed impartiality is likely to have great weight with the jury, and such fact of necessity requires impartial conduct on his part. We have had occasion heretofore to comment upon the conduct of the trial judge in taking over and examining witnesses under examination by respective counsel, and his comments in the presence and hearing of the jury. * * * "

The court then cited Adler v. United States, 5 Cir., 182 F. 464, 472, and Hunter v. United States, 5 Cir., 62 F.2d 217, 220.

■■ We realize that an alert and capable judge at times feels that he can assist in developing the evidence by participating in the interrogation of witnesses. However, he would ordinarily do well to forego such intrusion upon the functions of counsel, thus maintaining the court's position of impartiality, in the eyes of the ever-observant jurors. The record in this case reveals no justification for the extensive intervention of the able trial judge.

For these reasons, we believe that the court erred and that a new trial must be granted to Carmel. The judgment below is reversed and this cause is remanded to the district court for a new trial of the defendant Carmel.

Reversed and remanded for a new trial.

DUFFY, Chief Judge (concurring).

Judge SCHNACKENBERG has quoted extensively from the examination of witnesses which was conducted by the trial court. Separately considered, many of such quotations would not, in my mind, be a basis for a holding of prejudicial error. However, taken all together, I have been forced to the conclusion that in this close case the attitude of the learned trial judge must have had great influence with the jury, and the "atmosphere of impartiality" was thus destroyed.