Howard P. CARROLL and H. Carroll & Co., Appellants,

v.

UNITED STATES of America, Appellee.

No. 18551.

United States Court of Appeals Ninth Circuit.

Dec. 10, 1963.

Rehearings Denied Jan. 24, 1964.

W. H. Erickson and C. Henry Roath, Denver, Colo., and David M. Garland, Newport Beach, Cal., for appellants.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Section; and John A. Mitchell, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and DUNIWAY, Circuit Judges, and PENCE, District Judge.

DUNIWAY, Circuit Judge.

Carroll and H. Carroll & Co., a corporation, were convicted by the verdict of a jury under each of six counts of an indictment charging them with fraud in the sale of securities in violation of section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)). In their appeal they make thirteen claims of error, many of which can be considered together. We conclude that the judgment must be affirmed in part and reversed in part.

In the case of Carroll the judgment imposes a fine of $2500 concurrently on each of the six counts, so that the total fine is $2500. Imposition of sentence of imprisonment was suspended and he was placed on probation for a concurrent period of one year. Thus all of the sentence is concurrent, and conse-

quently, under the long established rule in this circuit, if his conviction on any one of the counts is adequately supported, the judgment must be affirmed. On the other hand, in the case of the corporation, it was sentenced to pay a fine of $50 on each of the counts, or a total of $300. Thus the sentences of the corporation were not concurrent and if there is reversible error as to any count, the judgment upon that count must be reversed.

### 1. The sufficiency of the evidence.

■■ Both appellants assert that the jury's verdict is not supported by the evidence. In considering this question we state the evidence in a light most favorable to the government. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Mosco v. United States, 9 Cir., 1962, 301 F.2d 180; Castro v. United States, 9 Cir., 1963, 323 F.2d 683. Conflicting evidence does not change the rule; it was for the jury, not this court, to resolve conflicts.

The indictment charges that the appellants, in the offer and sale of common stock of a Nevada corporation, Comstock, Ltd., employed a device, scheme and artifice to defraud, obtained money and property by means of untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading. It then proceeds to outline in some detail the nature of the scheme.

Not all of the allegations of the indictment were proved, but the government did produce evidence, which, if believed by the jury, would permit it to find that the appellants, in the sale of the stock, did do certain things charged. They used, in selling the stock, a brochure which contained untrue statements of material facts and which omitted to state material facts necessary in order to make the statements that it did contain not misleading. Investors were also told that the stock was being sold to them at the then current market price but were not told that the market price was an artifi-

cial one created by appellants, or that this was done for the purpose of enabling appellants to sell, at a substantial profit, a block of stock which they had a right to buy at a price well below the market price which they had created. As to all but one of the six individuals named in the six counts in the indictment, as the parties defrauded, the stock sold was a part of that block of stock.

One Alison arrived at the notion that it would be possible to go into the large scale production of charcoal from oak trees growing on a ranch located in Ventura County, California, and apparently owned by his wife. He had permitted one itinerant charcoal burner to produce a little charcoal on the place and he thought that it would be possible to use the large number of live oak trees on the property to produce charcoal in quantity. He had built one or two kilns for this purpose, but the charcoal produced was too wet and was not satisfactory. He had also acquired the right to take oak trees from some adjoining properties and he had purchased and sold some charcoal from other sources. He had made arrangements to sell some charcoal to at least one chain of markets in Los Angeles. However, the venture had not proved profitable, the ranch operation was in the bankruptcy court in a reorganization proceeding, and he needed financing.

Comstock, Ltd., was a Nevada corporation whose shares were listed on the San Francisco Mining Exchange. Arrangements were worked out whereby the charcoal operation and its assets were transferred to Comstock, Ltd. by Alison in exchange for stock. One reason for doing this was that the stock was already listed on the mining exchange, so that there would be no need to register with the Securities and Exchange Commission. A San Francisco broker named Chevrier had acquired a large block of stock of Comstock, Ltd. Alison agreed to buy 500,000 shares of this stock by giving his promissory notes, for which a single note was later substituted, in the sum of $125,000. The price was thus 25 cents a

share. This stock was then transferred to an "escrow" with a corporation in Denver, Colorado, called the Security Trust and Transfer Company. The arrangement was that H. Carroll & Co., one of the appellants here, could take down these 500,000 shares from time to time at 25 cents a share.

Carroll was a stock and bond broker and he did business through H. Carroll & Co. of which he was president and the controlling stockholder. The head office was in Denver, and a branch was opened in Beverly Hills. Carroll and H. Carroll & Co. had been brought into the transaction at the time that the charcoal operation was transferred to Comstock, Ltd. and the purpose was to enable Alison to raise funds for this operation. Carroll met with Alison and others and he had one of his associates named Leopold, who was a minority stockholder in H. Carroll & Co., become a member of the Board of Directors of Comstock, Ltd. There was also a meeting in the Beverly Hills office of H. Carroll & Co., attended by Carroll, the purpose of which was to instruct the salesmen in relation to the sale of the stock of Comstock, Ltd.

One Raetz was employed and paid by Carroll or H. Carroll & Co. to prepare a brochure, a tastefully printed pamphlet entitled "Charcoal," and "A Report on One of the Fastest Growing Industries in the Country," and describing itself as a report to stockholders from Comstock, Ltd. This brochure paints a rosy picture of Alison's charcoal business and asserts that Comstock, Ltd. is the largest producer of charcoal in the West. It contains a picture of Comstock kilns designed for mechanical loading and unloading, each kiln holding 12 cords and, after ten days of burning, producing eight tons of charcoal. There is also a statement of projected production for 1957–58 indicating profits per month of over $50,000. The brochure was actually produced as a selling document; the projection of production and profits was wholly fictitious; no such kiln existed as that pictured in the brochure; many of the other statements in the brochure were, to say the least, the grossest type of exaggeration. The brochure did not state that the operation had never been profitable, as was the fact, said nothing about the escrowed stock which was available to Carroll and his company at 25 cents a share, and omitted much other information which would obviously be necessary to make the statements that it contained not misleading. A quantity of these brochures was sent to the Denver office of the appellants, and they were used by salesmen in the Beverly Hills office in selling stock of Comstock, Ltd. Several of the individuals named in the indictment as defrauded purchasers were given the brochure by salesmen for appellants.

The selling campaign occurred in the early part of 1957. During that time the appellants received from the Denver escrow at 25 cents a share about 300,000 shares of Comstock, Ltd. and of these shares over 280,000 were sold to purchasers in California. During the same period appellants were active in buying stock of Comstock, Ltd. on the San Francisco Mining Exchange, these transactions being handled through Chevrier, who was a member of the exchange. The total number of shares sold over the mining exchange during this period was 131,000 of which 87,000 were purchased by appellants at prices ranging from 27 cents to 36 cents per share.

Leopold testified that on instructions from appellant Carroll, and in his capacity as an officer of H. Carroll & Co. he sent the following teletyped message from the Denver office to the Beverly Hills office, to one Martin McIntyre who was one of the two men in charge of the Beverly Hills office:

"Marty LA this Bob you there Ga

"This me Ga

"OK kid been working like a demon Comstock will be 33-40 in few minutes as soon as exchange opens We have it worked out now and if your boys going to sell any they should do it quick like We are going to do everything in our power to maintain market at this level You should call Ralph and get his orders in We

doing this at a pretty healthy expense so pls give us support out of that office Ga."

"OK Wonderful Wht price will we sell at now so as to correspond to mkt Ga

"Well I would wait ten minutes until mkt opens and then check with Aronson and see how it quoted I sure it GG to be 33-40 and you should sell at 36 or so. NY is retailing it at 40 a healthy price Yes Ga."

Comment by us seems superfluous.

Buyers of stock who testified were told by salesmen for appellants that they were buying at the market price, were given the brochure and were otherwise given a most rosy picture of the status and prospects of the company.

█ It would unduly extend this opinion to state in detail all of the evidence, both oral and documentary, that supports the foregoing brief outline of what happened. We are of the opinion that the evidence, viewed as a whole, is more than sufficient to sustain the conviction of both appellants. Indeed, we think it would have been difficult for any jury to find them not guilty.

### 2. Objections to evidence.

#### A. The records of Nevada Agency and Trust Company.

The government offered in evidence and the court received certain records of the Nevada Agency and Trust Company of Reno, Nevada. These are exhibits 28, 29, 30 and 31. They were ruled admissible under the Federal Business Records as Evidence Act, 28 U.S.C. § 1732. Exhibits 28, 29 and 30 are books of cancelled stock certificates and transfer instructions relating to the stock of Comstock, Ltd. Exhibit 31 is a series of numerical control ledger sheets showing stock transfers of Comstock, Ltd. stock beginning with the sale of stock under assessments in June of 1956 and continuing until July 17, 1957. The appellants stipulated that these exhibits were obtained from the Nevada Transfer Agency and were a part of the records of that company, and that they related to the stock of Comstock, Ltd. No further identification of these records was offered and the court admitted them on the basis of this stipulation.

█ Appellants assert that an insufficient foundation was laid and that the records are inadmissible hearsay as against the appellants. Reliance is placed upon our decision in Niederkrome v. Commissioner, 9 Cir. 1958, 266 F.2d 238. The basic holding in that case, however, is that the record there involved, consisting of an inter-office memorandum which was the minutes of an executive committee meeting distributed by the corporation to its affiliate, was not a record made in the regular course of business within the meaning of the statute. The meeting, at which the defendant in that case was not present, concerned a proposed loan to that defendant and the document was full of self-serving statements and opinions. It was not the type of record which is kept in the normal course of business in the sense in which books of account, ledgers and other documents showing a series of business transactions are kept.

Here, the very records themselves show on their face that the Nevada Agency and Trust Company was acting as the transfer agent for the stock of Comstock, Ltd., or, at the least, was in the business of keeping the records of such transfers, and they also show that the documents are such records. Once it was stipulated that they were the records of that company and that they did relate to Comstock, Ltd., they are on their face self-proving. (See our comments in Sam Macri & Sons v. United States, 9 Cir., 1963, 313 F.2d 119 at 128.)

No doubt it would have been better practice for the government to have produced an officer or employee of the Nevada Agency and Trust Company who could have identified the records and testified that they were kept in the regular course of business. However, we think that this was not essential in this case. Our examination of these records indicates that they obviously were kept

in the regular course of business and that they certainly were not later created by some minion of the government for the purpose of convicting these appellants. Nowhere is there any contention in the briefs of the appellants that they were not in fact kept in the regular course of business or that they are inaccurate. In Stillman v. United States, 9 Cir., 1949, 177 F.2d 607, 618, we held that the statement by the appellant in that case to a witness who produced certain records that the records were "the books" of the appellant's partnership was a sufficient foundation to show that the entries were made in the regular course of business. We think the stipulation here was sufficient when taken together with the nature of the records as disclosed by an examination of them.

■ The assertion that these records are hearsay as to the appellants and therefore inadmissible, even if a sufficient foundation were laid under the Federal Business Records as Evidence Act, is without merit. They show what transfers were made of the stock of Comstock, Ltd. They also show, taken in connection with another exhibit (27) to which no objection is made by appellants, that the stock sold to the individuals named as defrauded investors in the six counts of the indictment came (with an exception hereafter discussed) from the stock in the Denver escrow at Securities Transfer Corporation. The records are thus clearly relevant in this case.

■ If, in a lawsuit between A and B, the nature of a series of transactions between B and C becomes relevant, and if its nature is recorded in C's business records, then surely those records, properly identified, can be used to prove the transactions. Indeed, the complexity of modern business is such that there may be no other way to prove them. It may well be that no available witness or group of witnesses could testify as to each fact recorded. It is the purpose of the Federal Business Records as Evidence Act to eliminate the hearsay objection that could otherwise be made, unless the party offering the records produced each individual who participated in making them, and had each testify as to how they were made, what his part was in making them, and that in performing that part he made accurate records. (See McCormick, Evidence, § 289, p. 606–7 (1955).) The guarantee of veracity is in the fact that they are regular business records and were not made for the purposes of litigation. The only available objection then becomes one of relevancy or materiality, not hearsay.

### B. The records of Chevrier & Co.

■ The government offered in evidence exhibits 18 and 104. These are confirmation slips, delivery tickets and comparable documents which record purchases of Comstock, Ltd. stock by Carroll & Co. from Chevrier. Appellants complain that no proper foundation was laid and that there was no showing that the records were relevant, competent or material against the appellants. Assuming that a proper foundation was laid, they are clearly relevant. They show appellants' purchases of the stock during the period in question, which according to the government's theory, were designed to and did inflate the market price.

A number of items of evidence establish the needed foundation. There is evidence that all tickets relating to purchases and sales of Comstock, Ltd. stock were required by Carroll to pass over his desk and be approved by him. One Uhlir, an accountant employed in the Denver office of Carroll & Co., examined the documents. He could not specifically identify any individual document as one that he remembered, but he did testify that they were the type of documents that crossed his desk relating to the purchase of Comstock stock during the period in question. One Lowenstein, who was office manager for Chevrier during the period in question, testified that these were the records which Chevrier kept and filed in relation to sales transactions. One Ziering testified that he obtained these records from Chevrier's storage files in the San Francisco Mining Exchange in the company of Mr. Chevrier. The docu-

ments themselves show what they purport to be, i. e., records of purchases by Carroll & Co. from Chevrier of the stock of Comstock, Ltd. during the period in question.

Everything that we have said as to the records of Nevada Agency and Trust Company is equally applicable here. It is hardly surprising that the witnesses were unable to identify specific transactions, considering the volume of business done and the lapse of time that had occurred.

Normally, of course, there would be, in the records of appellants, corresponding records to those of Chevrier relating to appellants' purchases. However, appellant Carroll admitted to an investigator of the Securities and Exchange Commission that such records had been burned before the trial, upon his instructions. This makes our comments in the case of Sam Macri & Sons, supra, even more pertinent.

C. *The letter from one Fleishell to the Securities and Exchange Commission.*

█ There was introduced in evidence a letter from an attorney in San Francisco named Fleishell to an investigator for the Securities and Exchange Commission, dated October 18, 1957. This letter contains a list of the certificates for common stock of Comstock, Ltd. which went into the Denver escrow. It was identified as coming from the files of the Securities and Exchange Commission. No other foundation whatever was laid.

It was clearly error to admit this letter in evidence. It may have been a part of the regular course of business of the Securities and Exchange Commission to keep in its files such letters as this. It is certain, however, that the letter was not prepared in the regular course of business by any employee of the Commission. On the contrary, it was prepared by the writer of the letter. There is nothing in the record to indicate that he had anything whatever to do with the case, although it could perhaps be inferred that at the time that he wrote the letter he was an attorney representing Alison. There is nothing to indicate the source from which he obtained the information. The fact that the certificates listed in the letter were issued to the persons named in the letter and represented the number of shares of stock listed in the letter can be verified from the numerical control ledger of Nevada Agency and Trust Company referred to above. But there is nothing in the latter records that shows what stock went into the escrow. We think that under our decisions in Standard Oil Co. of California v. Moore, 9 Cir., 1957, 251 F.2d 188, 214; Olender v. United States, 9 Cir., 1954, 210 F.2d 795, 802, 42 A.L.R. 2d 736, and the Niederkrome case, supra the admission of this letter was error. See also Johnson v. Lutz, 1930, 253 N.Y. 124, 170 N.E. 517, 518.

We are also of the opinion, however, for reasons stated below, that the admission in evidence of this letter was not prejudicial.

D. *The promissory notes given by Alison.*

█ Exhibit 1 consists of six promissory notes, dated January 1, 1957, given by Alison to pay for the 500,000 shares of stock that ultimately went into the Denver escrow. The record indicates that these notes were subsequently replaced by a second note given by him in the amount of $125,000. It is urged that they have no relevancy in this case, and that they are hearsay. The relevancy of the notes is that they show the price that Alison paid for the stock. They are not hearsay. They are just as much a physical fact in the case as the live oak trees on the Alison ranch, or the lack of the kilns on the ranch that are referred to in the charcoal brochure. (Sica v. United States, 9 Cir., 1963, 325 F.2d 831.) Moreover, we can conceive of no possible basis on which their admission could be said to be prejudicial.

E. *The testimony of the witness Sillick and the charts prepared by him.*

█ Sillick, an investigator and an accountant employed by the Securities

and Exchange Commission, prepared two charts, exhibits 105 and 106, and these were received in evidence after he described the method by which they were prepared. Exhibit 105 is a chart which purports to trace the shares purchased by the six investors named in the respective counts of the indictment back to the 500,000 shares that were placed in the Denver escrow. Sillick used exhibit 22 in preparing this chart. He also used the records of Nevada Agency and Trust Company. The government now asserts that all of the information on this chart can be obtained from these records, plus exhibit 27, without the use of exhibit 22. Our examination of these exhibits shows that this statement is correct, except as to 500 shares that were sold to one Wisda and 1,000 out of 2,000 shares that were sold to a Mr. and Mrs. Johnson. Under these circumstances, therefore, exhibit 105 was properly received in evidence as a chart showing information appearing in records that were in evidence and were available to appellants for the purpose of checking the accuracy of the chart on cross-examination or otherwise. (See Corbett v. United States, 9 Cir., 1956, 238 F.2d 557; Papadakis v. United States, 9 Cir., 1953, 208 F.2d 945; Noell v. United States, 9 Cir., 1950, 183 F.2d 334.) It follows that the admission of exhibit 22 was merely cumulative, except as to the Wisda and Johnson counts. As the matter was presented, the jury's attention was directed to exhibit 22 rather than to exhibit 27 as a supporting document. We fail to see that this makes a difference. Exhibit 27 shows that, except as noted below, exhibit 22 was correct.

As it relates to the 500 shares sold to Wisda and to 1,000 of the 2,000 shares sold to the Johnsons, exhibit 105 was not admissible because, without exhibit 22, which we have held to be inadmissible, the information relating to those shares cannot be found in the records that were produced. No doubt, if appellants had brought out these facts, the court would have had that portion of the exhibit blocked out as it did with certain information that appeared on exhibit 106 when it was produced and before it was introduced into evidence.

The question of prejudice remains. We can see nothing prejudicial in the exhibit as it relates to all counts except count 1, which describes the Wisda sale, and count 4, which describes the Johnson sale. In the case of the Johnson sale, at least half of their stock was traced into the escrow and we think that the fact that the other half was not, does not make the use of the exhibit prejudicial. Moreover, Johnson, who bought at 32 cents a share, testified to various misrepresentations other than failure to disclose that their stock came from the Denver escrow at 25 cents per share.

In the case of the Wisda stock, none of it was traced into the escrow and we think this raises a more serious problem. We are convinced that the government could have proved its case without tracing any of the stock into the escrow. We cannot see that it makes any substantial difference whether the particular shares that a particular investor received came from the escrow. The only basis on which this could be said to make a difference would be that, as to that investor, no misrepresentations were made except as to the source of the stock. In the case of Wisda, there is testimony that he was told the price and that the stock had good possibilities of going over $2 a share in the near future. He was told that Carroll had a block of the stock. There is no other evidence as to what representations were made to him before he bought the stock. He paid 32 cents a share. We think, under these circumstances, that the use of the chart, exhibit 105, in relation to the Wisda transaction, was prejudicial error. For reasons heretofore stated, however, this does not require a reversal as to the appellant Carroll. It does require a reversal as to the first count in the case of appellant H. Carroll & Co.

We think that the other chart, exhibit 106, was properly received in evidence as corrected upon orders of the court, when it developed on the examination of Sillick

that certain of the information on it was not supported by any records produced. This information was blocked out by covering it with tape. As corrected, it shows the number of shares of the stock of Comstock, Ltd. traded on the San Francisco Mining Exchange in March, April, May and June of 1957 and the number of those shares purchased by Carroll & Co. during the same months. This information came from records of the mining exchange to which objection is not made before us, and from exhibits 18 and 104 heretofore discussed. It is now urged that Chevrier's confirmations to H. Carroll & Co. show that most of the shares were bought by the latter as agent, rather than for its own account. This, however, seems to us to be immaterial. Counsel claims that the figures on the charts do not check exactly with what exhibit 104, on which it was based, purports to show. The errors, however, if errors they are, are not large and have no relevancy to the basis upon which the exhibit is material, namely, to show the large portion of the stock traded on the exchange which was purchased by H. Carroll & Co. We find no error in the admission of exhibit 106.

### F. *Telephone conversation between Ralph Frank and Ward Dawson.*

▮▮ The witness Frank, an attorney at law, early in 1957, was the resident agent in California of H. Carroll & Co. and its corporate counsel, and did certain legal work for it in connection with filings before the California Commissioner of Corporations. He was asked to examine the brochure and presented it to the office of the Commissioner of Corporations as a piece of advertising to be used in the State of California by H. Carroll & Co. The brochure was disapproved by the California Corporation Commissioner. Frank then testified that early in 1957 he had a conversation with one Henry Ward Dawson, the subject matter being whether or not the brochure would be approved by the Corporation Commissioner. At that time Frank was representing both Comstock, Ltd. and H. Carroll & Co. and he got certain in-

formation from Dawson about Country Club Charcoal, which had been organized by Alison before the charcoal operation was turned over to Comstock, Ltd. Dawson was Alison's attorney, he prepared the promissory notes which were given by Alison in connection with his acquisition of the 500,000 shares that went into the Denver escrow, and it was he who, according to the evidence, authorized the release of shares from the escrow and received some of the moneys realized from their sale and forwarded them to Alison. Since Frank had been retained by H. Carroll & Co. in connection with the brochure, and since he was getting information in that connection from Dawson, and since Carroll & Co. thereafter used the brochure with the knowledge of Carroll, we think that the admission of this conversation was proper. We think that there was ample other evidence that Carroll and his corporation, along with their employees, especially their salesmen, were parties to a scheme to defraud, as charged in the indictment. Thus this conversation, as a part of Frank's activities in their behalf, was admissible. See Coplin v. United States, 9 Cir., 1937, 88 F.2d 652; Robinson v. United States, 9 Cir., 1929, 33 F.2d 238.

We note also that Dawson was a witness in the case and appellants could have called him and cross-examined him about this conversation had they felt it would be helpful for them to do so. Under these circumstances, even if we were to agree that it was error to admit the testimony of Frank regarding the conversation, we cannot find that it was prejudicial. Most of what Dawson told Frank was also testified to by other witnesses, so that the evidence was cumulative.

### 3. *Claimed error in denial of a motion to strike surplusage from the indictment.*

▮▮ Before the trial the appellants moved to strike from the indictment, which alleged certain specific misrepresentations and omissions to state material

facts, language stating that "other similar untrue, deceptive, and misleading statements of material facts" were made and indicating that the list of items of information not disclosed "included" those items, thus implying that there were others. They rely on United States v. Pope, D.C.S.D.N.Y., 1960, 189 F.Supp. 12, 25 and 26. We cannot find that any of these allegations were either prejudicial or inflammatory, and we do not think that the trial court abused its discretion in denying the motion. (See Gambill v. United States, 6 Cir., 1960, 276 F.2d 180; United States v. Courtney, 2 Cir., 1958, 257 F.2d 944.) If the defendants feared that the government would attempt to prove other misrepresentations or omissions not mentioned in the indictment, they could have asked for a bill of particulars, but they did not do so.

### 4. *The conduct of the trial by the judge.*

██ Appellants make an extended and bitter attack upon the manner in which the trial judge conducted the trial. We think that the attack would be more effective had it come from the Government. The record indicates that the judge, who has been a successful and vigorous trial lawyer and prosecutor, became convinced, early in the trial, that the Assistant United States Attorney who was trying the case did not know how to frame questions or to lay a foundation for the admission of evidence. Throughout the trial the judge was repeatedly and sharply critical of the manner in which the Assistant United States Attorney was trying the case. There is much justification for the judge's feeling. Many of the prosecutor's questions were poorly phrased, calling for conclusions rather than facts. What we have already said indicates that he did not always do as well as he should have in laying a foundation.

However, the judge's reaction to the prosecutor led him into a performance which is not to be commended. He repeatedly throughout the trial made objections to the prosecutor's questions when none was made by defense counsel, and sustained those objections. Some of his criticisms of the prosecutor were captious. Defense counsel did not object, and there was no reason for the judge to object. On several occasions when the prosecutor, perhaps intimidated by the judge, was having difficulty in laying a foundation for the admission of evidence, the judge took over and laid the foundation himself. In at least one instance, when defense counsel objected that a foundation had not been laid, the court proceeded to lay it and then overruled the objection.

Much of what the court did was, in a sense, helpful to the prosecutor, and by doing it he performed the dual role of judge and prosecutor. This is a very dangerous thing for a judge to do, as it can easily lead the jury to believe that the judge is aligned with the prosecution. However, after carefully reading the entire record, we cannot find that the jury could possibly have so concluded in this case. On the contrary, we think the total effect of the judge's behavior would be to lead the jury to either or both of two conclusions: (a) that the prosecutor did not know how to try the case, and (b) that the prosecutor's case did not amount to much. The "help" that the judge gave the prosecutor was of a technical, rather than a substantive nature. It did not add any evidence to the record that the prosecutor had not planned to produce, and the record convinces us that without this "help" the prosecutor would have gotten the same evidence before the jury. The one possible exception is exhibit 22, which we have already considered.

Every experienced trial lawyer knows that he can sometimes win a case by getting in wrong with the judge to the point where the jury begins to sympathize with the lawyer and loses sight of the merits of his case, awarding the lawyer a verdict because they feel sorry for him as a result of the way the judge has

treated him. Our review of the record persuades us, however, that that did not happen in this case.

The judge seemed to be fully aware of what he was doing; on no less than ten occasions during the trial, after he had taken over the examination of a witness or the laying of a foundation for documentary evidence, or both, he carefully instructed the jury, in substance, that they were to draw no inferences from his behavior, that they were to decide the case solely on the evidence, and that he was merely acting in the interests of getting at the truth and expediting the conclusion of the trial. He also gave a similar instruction on voir dire and again when he submitted the matter to the jury. We must presume that the jury followed these instructions. There were rare instances in which he abused defense counsel, but they happened so seldom, and his language was so mild as compared to his treatment of the prosecutor, that we cannot believe that the defense was thereby prejudiced.

 It is also claimed that the rights of the defendants were prejudiced because the court required defense counsel to make legal arguments on the admissibility of evidence in the presence of the jury. There were at least seven occasions on which this occurred. On the first occasion when permission was requested to approach the bench, the court said: "No, speak out. This looks like a sensible jury and if you say something you should not say, I will instruct them to disregard it, so speak out." On the next occasion there was a lengthy discussion between court and counsel as to who controlled H. Carroll & Co. Again, no instruction was given to the jury and the court refused permission to approach the bench. On the fifth occasion, the court did instruct the jury. At that time, in response to an objection made by defense counsel that the discussion should not be in the presence of a jury, the court said: "This jury is above 12 years of age. The Court will instruct them to disregard any colloquy between counsel and anything the Court or counsel says in ruling on the evidence or questioning the evidence." This he also did on the sixth occasion. On the last occasion, in the course of a colloquy, the court said: "Just forget there is a jury. Now go ahead," and proceeded to permit the prosecutor to make a statement as to his theory.

A decent regard for the rights of defendants in a criminal trial, particularly in a complex case where argument as to the admissibility of evidence, especially its relevance, is bound to involve assertions by the prosecutor as to how the evidence bears upon the issue that the jury must decide and what it will prove to the jury, should lead the court to incline toward holding such arguments out of the presence of the jury. This can be done either at the bench or by excusing the jury, and in either event, it is perfectly possible to make a record of the colloquy so that the rights of the parties will be protected. (See Eierman v. United States, 10 Cir., 1930, 46 F.2d 46.)

Nevertheless, it is clear that the court has a discretion in this matter. (Holt v. United States, 1910, 218 U.S. 245, 249–250, 31 S.Ct. 2, 54 L.Ed. 1021.) We have carefully examined each instance in which such a colloquy before the jury occurred, and while we think that in one or two instances the court's comments on the respective contentions of the parties should have been less sharp than they were, and that one or two of them were unfortunate in that they brought before the jury matters that it would be better that they had not heard, we cannot find that any of them, or all of them together, were prejudicial, especially in view of the instructions that the court repeatedly gave the jury.

It is also asserted that the Assistant United States Attorney continually and repeatedly asked leading questions of prosecution witnesses over the court's warning and after continued and repeated objections were made. There were a few such instances. The one principally objected to occurred when the court permitted the prosecutor to cross-

examine one of his own witnesses. We think that this was proper because the witness was obviously, even on the cold record, a reluctant witness. In most cases, however, the questions were not objected to, and in many cases where there were objections, the questions were not really leading. The matter was within the discretion of the court and we cannot find that that discretion was abused. Appellants cite Gill v. United States, 5 Cir., 1961, 285 F.2d 711, and United States v. Fry, 7 Cir., 1962, 304 F.2d 296. In Gill the continued asking of leading questions was held not prejudicial. Fry deals with leading questions by the judge.

### 5. *The court's instructions.*

█ Counsel do not assign the giving or the failure to give any instructions as erroneous, nor could they, because at the conclusion of all the instructions and after the court had, at their request, given the jury a number of additional instructions, they made no further objection to the instructions. (Rule 30 F.R. Crim.Proc.)

█ Counsel's argument takes a different tack. They object because, after the parties had rested and before the court instructed the jury, the following colloquy occurred:

"THE COURT: Counsel for the defense, the reason I didn't bring the jury back, I want to be sure that we understand each other on Rule 30. I realize that Rule 30 says that the Court shall inform counsel of the instructions it proposes to give. I never insisted on the court doing it because I felt I was fully capable of pointing out the errors in the instructions. If you feel in any way that will work to your prejudice by not indicating the instructions I'm going to give, I'll indicate them to you in a general way.

"MR. ERICKSON: I think that would be very helpful.

"THE COURT: Do you think it will work any prejudice in any way?

"MR. ERICKSON: It would, your Honor.

"THE COURT: Then I will cut some of the instructions I am going to give for you. They are very favorable. Those go out. So I'll tell you now what I'm going to give.

"MR ERICKSON: Just a moment.

"THE COURT: I'm going to give them to you.

"MR. ERICKSON: We will withdraw our objection.

"THE COURT: No. I'm going to give them now. The issue has been made. Here are the instructions I am going to give."

We cannot condone or encourage this sort of petty tyranny on the part of any judge. The difficulty, however, is that it is not a basis for reversal. It did not occur in the presence of the jury and, in fact, the court did not carry out its threat. On the contrary, after it had outlined the instructions that it did intend to give, the court said: "I will give you ample time after the instructions are given to assign any error. Anything further on that situation?" To this defense counsel replied: "I think the Court has been extremely fair." Moreover, after it had given its instructions, the court had an extended conference with counsel at which defense counsel requested additional instructions, they were discussed in a dispassionate manner, and most of them were given. Thus, however reprehensible the court's statement may be, it in no way affected the outcome of the case and it is thus no basis for an assignment of error.

### 6. *Did appellants have a fair trial?*

█ Finally, counsel asserts that the cumulative effect of all of the matters that we have discussed was such that we must hold that the appellants did not get a fair trial. We have carefully examined the entire record with this contention in mind, but we cannot accept it. We have no doubt that the court went farther than it should have in interjecting itself into the trial of the case, in

creating objections where none was made by counsel, in doing some of the prosecutor's work for him, and in making comments critical of counsel in the presence of the jury. The cases in which such behavior has been condemned by the appellate courts are numerous and we hope that the trial judge will read some of them and take what they say to heart. Some of them are Williams v. United States, 9 Cir., 1937, 93 F.2d 685; Pasqua v. United States, 5 Cir., 1945, 146 F.2d 522; Zebouni v. United States, 5 Cir., 1955, 226 F.2d 826; United States v. Ah Kee Eng, 2 Cir., 1957, 241 F.2d 157, 62 A.L.R.2d 159, and particularly United States v. Carmel, 7 Cir., 1959, 267 F.2d 345, 350. There the court said:

"We realize that an alert and capable judge at times feels that he can assist in developing the evidence by participating in the interrogation of witnesses. However, he would ordinarily do well to forego such intrusion upon the functions of counsel, thus maintaining the court's position of impartiality, in the eyes of the ever-observant jurors. The record in his case reveals no justification for the extensive intervention of the able trial judge."

A federal judge is no mere umpire; he has the right, and often the duty to intervene to be sure that justice is done and to assure effective and expeditious disposition of the case. Here, the judge went farther. There is a natural tendency for a newly appointed trial judge, who has himself had long years of experience as a trial lawyer and prosecutor, to feel that he can try the case better than the attorneys who are before him, particularly when as in this case, one of them is young and inexperienced. The prosecutor here was not as adept in framing questions or in laying a foundation for the admission of evidence as the trial judge was. We suspect, however, that if the trial judge had let him try his case he would have done so effectively and the result would not have been different.

We feel confident that with increasing experience upon the bench the trial judge will decide, as others have before him, that it is the part of wisdom to refrain from unnecessary interference with counsel in the presentation of their case. Such interference may destroy a perfectly valid strategy, it may ruin a cross-examination which would otherwise be quite effective, and above all, it may give to the jury a false impression of partiality which in a particular case may be so serious as to require a retrial of the case. We do not think that the judge's conduct here is in that category. But it has compelled us to scrutinize the entire record with great care, because we are firmly convinced that no conviction which is obtained in an atmosphere of prejudice, particularly where that atmosphere is created by the judge himself, should be allowed to stand.

### 7. *The statute of limitations.*

It is contended that counts 1, 5 and 6 of the indictment are barred by the statute of limitations, 18 U.S.C. § 3282. Were it not for the fact that the sentences of H. Carroll & Co. are cumulative rather than concurrent, it would be unnecessary to consider this contention; but that fact requires that it be considered. In the counts in question the delivery through the United States mail of a certificate for shares of stock of Comstock, Ltd. is alleged to have occurred, in count 1, on or about June 1, 1957, in count 5, on or about June 21, 1957, and in count 6, on or about June 25, 1957. The indictment was found on May 23, 1962. Thus the mailing of the certificates occurred within the five year period prescribed by the statute. However, Wisda, the purchaser named in count 1, received a confirmation of the sale on May 7 and sent his check to H. Carroll & Co. in payment for the stock on May 10; Bloemsma, the purchaser named in count 5, purchased his stock on April 10, 1957; Indorff, the purchaser named

86

in count 6, ordered and paid for his stock on May 6, 1957. All of these events occurred more than five years before the indictment was found. Appellants point out that the Securities Act of 1933 relates to sales and offers to sell (see section 17(a), 15 U.S.C. § 77q(a) and § 2(3), 15 U.S.C. § 77b(3)). Their position is that once the sale is made and completed by offer, acceptance and payment, the crime has been completed, and that the use of the mails thereafter to send the stock certificates, the only occurrence involved in these three counts that occurred within the period of limitations, merely provides the requisite federal jurisdictional basis. Such cases as Schillner v. H. Vaughn Clarke & Co., 2 Cir., 1943, 134 F.2d 875; Blackwell v. Bentsen, 5 Cir., 1953, 203 F.2d 690, and Creswell-Kieth, Inc. v. Willingham, 8 Cir., 1959, 264 F.2d 76 do hold that, for jurisdictional purposes the mailing is part of the offense. However, they also indicate that while the mailing requirement is jurisdictional, it is not the essence of the offense and may be merely incidental to it. See, also, United States v. Cashin, 2 Cir., 1960, 281 F.2d 669. Appellants assert that the sending of the certificate was merely incidental to the fraud and not a part of it, citing Getchell v. United States, 5 Cir., 1960, 282 F.2d 681. That case, however, does not deal with our problem.

■■ It is established law that the statute of limitations begins to run when an offense is completed (Pendergast v. United States, 1942, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368). Kann v. United States, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 is, we think, analogous. There, the Supreme Court pointed out that the fraudulent scheme involved (mail fraud) was completed when the defendants received the money that was intended to be obtained by their fraud, and that certain subsequent transactions (banking transactions) were merely incidental and collateral to it, and not a part of it. We are of the view that the position of the appellants is correct and that the three counts in question are barred by the statute of limitations.

(See 3 Loss, Securities Regulation, 1521–2 (1961)).

We think that, under the peculiar circumstances of this case, it would be unjust to the appellant Carroll to affirm his conviction upon the three counts in question while reversing as to his co-defendant. This is because reversal is not on the basis of procedural errors, but on the ground that prosecution for the offenses charged is barred by limitation.

The judgments against each appellant are reversed as to counts 1, 5 and 6, and are affirmed as to counts 2, 3 and 4.