**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Melvin L. MEDANSKY, Defendant-Appellant.**

**No. 72-1790.**

United States Court of Appeals, Seventh Circuit.

Argued June 15, 1973.

Decided Oct. 3, 1973.

As Amended on Denial of Rehearing En Banc Nov. 2, 1973.

Harvey M. Silets, Theodore A. Sinars, Louis Carbonaro, Peter J. Valentino, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, and Ann P. Sheldon, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before KILEY, PELL and STEVENS, Circuit Judges.

KILEY, Circuit Judge.

Melvin L. Medansky, an attorney, appeals from his conviction by a jury on ten counts of an eleven count indictment charging him, and Dr. William Becker, with devising and carrying out a scheme to defraud Medansky's clients and insurance companies in violation of 18 U.S.C. § 1341.[1] We affirm the conviction.

Each of the counts charged a separate instance of a specific mailing in the operation of the scheme. The indictment charged the following: Medansky agreed to refer accident victims to Dr. Becker who in turn would prepare false medical bills which both Becker and Medansky knew were false. Becker would then mail the bills to Medansky who then mailed them to the insurance companies. Upon obtaining a settlement of his clients' insurance claims, Medansky would deduct the full amount of the fraudulent medical bills from the settlement and then divide the excess payment with Becker.

The appeal before us is from the judgment in the second trial of the indictment. The first trial began on November 24, 1971. After presentation of the evidence by both sides, the case went to the jury, with the instruction that each count of the indictment should be treated independently. The jury was given three forms of verdict, one for conviction on all counts, another for acquittal on all counts, and a third for whatever verdicts the jury might find necessary among the several counts. The jury failed to reach a verdict, it so informed the court, and subsequently the court, over the objection of Medansky, declared a mistrial as a result of a hung jury. After the ruling Medansky moved for dismissal of the indictment on the ground of double jeopardy. The motion

---

1. "Frauds and swindles."

was denied, and the case was reset for the trial subject of this appeal.[2]

The second trial commenced on April 11, 1972, with the selection of the jury. Medansky renewed his motion to dismiss the indictment, on the double jeopardy ground. The motion was denied. Becker was called as the government's first witness. He testified that he had been a practicing physician since 1945, that in June, 1970, he was convicted of mail fraud for mailing false medical bills to an attorney other than Medansky, and that in return for probation agreed to testify truthfully in any future proceedings involving mail fraud of which he had knowledge.

Becker testified that he first met Medansky in late 1964 or early 1965, while Becker was working for another personal injury lawyer who was assisted by Medansky in a scheme similar to the one before us. According to Becker, Medansky asked Becker to join him in the alleged fraudulent scheme subject of the indictment, and both "understood" the fraudulent nature of the enterprise they were establishing.

Becker testified that during the operation of the alleged scheme, and until late 1968 or early 1969, Medansky referred 30 to 40 "patients" to him, and Becker prepared, with respect to each, and submitted to Medansky, an inflated bill, and that within six or eight months of Becker's submission of each bill Medansky would remit to him "40 to 60% of the face amount of the bill." Becker's testimony as to the method of referral, the date of the injury, the services actually performed, the services billed, and the amount he ultimately received, covered each of the eleven counts.

The testimony with respect to the ten counts of the indictment before us included descriptions of the accidents, the victims' contacts with Medansky, and their referral to Becker. The accident victims then described their contacts with and actual treatment by Becker. The insurance company representatives testified as to the total amounts of the settlements. Three of the insurance company representatives testified that their companies used mathematical formulas by which a multiplier was applied to the expenses submitted to determine the final payment due.

The cross-examination of Becker during three days extends over nearly 300 pages of the transcript. The aim of Medansky's attorney was to impeach Becker by showing his guilty plea to an indictment originally containing 17 counts, his "deal" with the government to testify against Medansky, contradictions between his testimony at the first and second trials, and his false medical bills sent to Medansky. The cross-examination adduced ample evidence for Medansky's purpose to enable the jury to measure Becker's credibility.

I.

THE CONSTITUTIONAL QUESTIONS

A. Medansky contends that the district court denied him his Sixth Amendment right to trial by jury in refusing to accept verdicts, if any, from the first jury on some counts of the indictment, and by refusing to inquire whether the jury had reached verdicts on any of the counts. He relies on Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L. Ed. 283 (1932), for the proposition that the district court had no power to decline to accept partial jury verdicts. There the district court, relying on its discretion, refused to issue a bench war-

2. In the interim, on January 10, 1972, Medansky filed a petition for a writ of mandamus in this court (No. 71–1025) seeking in the alternative an order that the district court dismiss the indictment, an order that the district court conduct a hearing to allow the defense to interrogate jurors in order to discover whether verdicts had been reached on any counts in the indictment, and an order staying the second trial until full hearing on the mandamus petition in this court. This court denied the mandamus petition without calling for a response, and subsequently the Supreme Court denied leave to appellant to file a petition for mandamus.

rant based on a proper grand jury indictment. The Court held that it was for the grand jury to determine probable cause and that the district court did not have the power to refuse to "enforce" the indictment. That decision is inapposite. The same is true of United States v. Thompson, 251 U.S. 407, 40 S. Ct. 289, 64 L.Ed. 333 (1920), and Ex parte United States, 242 U.S. 27, 37 S. Ct. 72, 61 L.Ed. 129 (1916).

■ We cannot say there was denial of Medansky's right to trial by jury in the court's refusal to make "an in-depth interrogation of each juror" to determine whether the jury had reached "possible verdicts" on any of the counts in "this case which charges an over-all scheme . . . to defraud." In United States v. Skidmore, 123 F.2d 604, 612 (7th Cir. 1941), this court approved a district judge's receipt of a guilty verdict in one of two consolidated cases and his inquiry of jury prospects of agreement upon the other indictment. The holding of this court there did not compel the judge here either to inquire about the jury's disposition on the various counts where there was no indication that agreement had been reached on any, or to permit Medansky's attorney to inquire whether the jury had reached verdicts on any counts. And no one can fairly infer from the colloquy with the foreman that some verdicts were reached. Neither does the second Circuit's decision in United States v. Cotter, 60 F.2d 689 (2nd Cir. 1932), or United States v. Frankel, 65 F.2d 285 (2nd Cir. 1933), compel that result here.

Even if we assume, arguendo, that the district court was compelled to accept partial verdicts, the record here does not warrant the premise that the jury had reached verdicts on some of the counts of the indictment. The record precludes application of Selvester v. United States 170 U.S. 262, 18 S.Ct. 580, 42 L.Ed. 1029 (1898), and Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). In fact, the last two sentences in the following quotation from *Selvester* 170 U.S. at 269, 18 S.Ct. at 582, support the contrary of Medansky's contention:

> Doubtless, where a jury, although convicting as to some, are silent as to other counts in an indictment and are discharged . . . the effect . . . is "equivalent to acquittal," . . . But such obviously is not the case, where . . . a disagreement is formally entered on the record. The effect of such entry justifies the discharge of the jury, and therefore a subsequent prosecution . . . [and] would not constitute second jeopardy.

Based on our analysis of the facts, we perceive no substance to Medansky's argument that the district court denied his Sixth Amendment right to trial by jury.

B. We think that the vital issue before us is whether Medansky's Fifth Amendment protection against being twice placed in jeopardy was violated by his second trial. He contends that the district court was under logical and legal compulsion to inquire whether the jury in the first trial reached a verdict on some counts of the indictment. No decision cited nor found has announced that rule, and our conclusion above in Section A weakens Medansky's contention on this vital issue.[3]

The touchstone for constitutional evaluation of the mandate of the double jeopardy clause of the Fifth Amendment is United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), involving discharge of a jury "unable to agree." There Justice Story stated the rule that "the law has invested courts . . . · with the authority to discharge a jury from giving any verdict, whenever . . . [under] all the cir-

3. In United States v. Conti, 361 F.2d 153, 159 (2nd Cir. 1966), the court held that the district court had not prejudiced the defendant by asking a jury, which was still deliberating and had not indicated it was in disagreement, which counts it was in agreement on, especially where all counsel acquiesced in that inquiry.

cumstances . . . there is a manifest necessity . . . or the ends of public justice would otherwise be defeated." He does not speak in terms of a duty incumbent on the court, but characterizes the court's responsibility as an "exercise [of] sound discretion" and a "power [which] ought to be used with the greatest caution." The issue therefore is not whether the district judge violated a duty in declaring a mistrial, but whether the court abused its discretion in exercising that power.

The *Perez* rule was substantially restated in the most recent opinion of the Supreme Court dealing with double jeopardy, Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973), where the Court said, after reliance upon *Perez:*

> This formulation, consistently adhered to by this Court in subsequent decisions, abjures the application of any mechanical formula . . ..
> The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court.
>
>     \*    \*    \*    \*    \*    \*
>
> Similarly, in Gori v. United States, 367 U.S. 364 [81 S.Ct. 1523, 6 L.Ed.2d 901] (1961), the Court again underscored the breadth of a trial judge's discretion, and the reasons therefor, to declare a mistrial.
>
> "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared . . . even over his [defendant's] objection, and he may

be retried consistently with the Fifth Amendment." *Id.,* at 368 [81 S.Ct. at 1526].

The Court in *Somerville*, at 467, 93 S.Ct. at 1072, stated "the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial."[4] Having once determined that jeopardy has attached, the court then looks to see if " 'manifest necessity' . . . or the 'ends of public justice' " require abrogation of the rule. *See* United States v. Perez, *supra.*

Some of the circumstances that qualify as exceptions to the general rule are: disqualification of a juror, death or other incapacity of the trial judge and probably of counsel, and the tactical needs of the military in time of war.[5] "The classic example is a mistrial because the jury is unable to agree. United States v. Perez, *supra;* Logan v. United States, 144 U.S. 263, 298 [12 S. Ct. 617, 628, 36 L.Ed. 429]; Dreyer v. Illinois, 187 U.S. 71, 85–86 [23 S.Ct. 28, 32–33, 47 L.Ed. 79]; Keerl v. Montana, 213 U.S. 135 [29 S.Ct. 469, 53 L.Ed. 734]." Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L. Ed.2d 100 (1963): Even this classic exception, however, is not to be "mechanically" applied. We rather look to the facts and circumstances surrounding the discharge "resolv[ing] any doubt 'in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion.' " *Downum* at 738, 83 S.Ct. at 1035, citing United States v. Watson, 28 F.Cas. pp. 499, 500–501, 16, 650a.

With these rules in mind, we turn to the question whether the district court

---

4. This statement was after commenting on the many exceptions to the fundamental rule "that a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again." Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221, 224, 2 L.Ed.2d 199 (1957), citing Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974;

Kepner v. United States, 195 U.S. 100, 128, 24 S.Ct. 797, 49 L.Ed. 114 (1904).

5. Note, 77 Harv.L.Rev. 1272, 1277 (1964), citing Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894); Simmons v. United States, 142 U.S. 148, 12 S. Ct. 171, 35 L.Ed. 968 (1891); Wade v. Hunter, 336 U.S. 684, 688–689, 69 S.Ct. 834, 93 L.Ed. 974 (1949); and others.

under the particular circumstances could properly exercise its discretion by declaring a mistrial as required by manifest necessity or public justice.

Before the jury retired, at the first trial, the district court gave three forms of verdict: one form for the jury to find guilt on all counts, another finding not guilty as to all counts, and a third form for the jury to find the defendant guilty or not guilty on one or more counts less than all. In the third form the jury could record its vote separately as to each count.

The jury retired for deliberation the morning of December 9, 1971. At 10:00 p. m. that night it had not reached a verdict. At 8:30 a. m. on December 10 the jury resumed deliberation. Some time before 11:00 a. m., the jury foreman reported to the marshal that the jury was in "irrevocable" disagreement, had been all along, and that "if it took two weeks they wouldn't arrive at a verdict." Over objections of Medansky's counsel the court determined that it would recall the jury at 12:30 p. m. and if no verdict was reached the court would declare a mistrial.

When the jury was recalled at 12:30 p. m. the following dialogue took place:

THE COURT: Good morning, ladies and gentlemen of the jury. Mr. Calligaris, I infer from your occupying the first seat, that you were elected the foreman of the jury. That is good circumstantial evidence.

The marshal has advised me that the jury, through you, or otherwise, have informed him that you are irrevocably in disagreement, is that correct?

THE FOREMAN: Right, sir.

THE COURT: He tells me, as a matter of fact, there has been no change in the position of the members of the jury since last evening with respect to verdicts in this case.

THE FOREMAN: That is correct.

THE COURT: I think under those circumstances then, that there will be no further purpose served in your deliberating further. Do you agree with that?

THE FOREMAN: Wholeheartedly.

THE COURT: Under those circumstances I am going to declare that you are in fact hung, if you tell me you are.

THE FOREMAN: Yes, sir, we are hung.

THE COURT: You are hung?

THE FOREMAN: We are hung.

■ In our view of the record there is no reasonable doubt that the district court could properly determine that there was a manifest necessity for declaring a mistrial and that public justice did not require that the trial continue. The circumstances surrounding the court's ruling we think clearly met the *Perez-Somerville* test. The jury was informed by the three forms of verdict that they could find Medansky guilty, or not guilty as charged, or guilty or not guilty as to each of the separate counts; and the forms were a constant reminder in the jury room throughout deliberation. The jury deliberated throughout December 9 until 10:00 p. m. and the next day from 8:30 a. m. to 11 a. m. when it told the court, through the marshal, that it was in irrevocable disagreement. The court decided to prolong the deliberation for another hour and a half. Upon recall the colloquy between the jury foreman and the court we think justified the court in concluding that it was clear that requiring further deliberation would be imprudent, of no possible benefit to Medansky or the government, and a waste of time of jurors, court and attorneys and a needless expense.

■ The record does not disclose whether the forms of verdict were returned to the courtroom. We know that verdicts were not reached with respect to the general forms. We cannot assume that any one of the forms was signed in any way. And the district court did not err in refusing to inquire whether the jury had reached a tenta-

tive verdict on the third form with respect to any of the counts. What decisions or concessions are made by jurors on any count of an indictment are not binding until a verdict is signed and returned in open court. Moreover, a normal response to the questions asked by the district court would have led the foreman to reveal a final verdict on some of the counts if his fellow jurors had agreed to and recorded a verdict on any count. We hold the district court under these circumstances did not abuse its discretion in declaring the mistrial in the first trial.

We are not persuaded by Medansky's argument that a mistrial was not necessary because the trial court had available alternatives that would have avoided the mistrial. His suggestion that the district court give a "modified" *Allen* charge, Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528 (1896), was rejected by the court which stated "it may very well have a coercive effect." Another alternative Medansky suggested was that he be allowed to question the jury about the possibility that any verdicts might have been reached. At the time of Medansky's first trial the appropriateness of the use of a modified *Allen* charge was highly controversial. The decision not to give such a supplemental instruction was within the discretion of the trial judge. *See* United States v. Brown, 411 F.2d 930 (7th Cir. 1969).[6] We have already found no error in the district court's refusal to probe into the state of mind with respect to tentative verdicts, where as here no formal verdicts are returned. No good purpose would have been served even if the court had inquired and received an affirmative answer. The court could not order the

tentative verdict made final. We think the district court was well within its right to reject Medansky's suggestion. The inquiry requested was pregnant with danger to the free deliberation so essential to the proper functioning of the jury.

II.

## CONTENTIONS AS TO CLAIMS OF ERROR AT TRIAL

In addition to the constitutional arguments raised, Medansky asserts five other grounds for reversal of his conviction at the second trial.

We see no merit in his challenge to the admission of testimony as to the ultimate disposition by Medansky of the proceeds obtained in the settlement of each claim subject of a count now before us. We see no prejudice to Medansky in the court's permitting employees of the victim insurance companies to testify relating to the formula used by the companies to reach a settlement in personal injury cases and the anticipated use of these funds. The testimony was merely to show the company's settlement procedures.

Medansky's contention that that testimony wrongfully accused him of cheating his clients is sufficiently refuted by the words of the indictment itself. It provides: "Melvin L. Medansky . . . and William Becker . . . devised . . . a scheme and artifice to defraud and to obtain money . . . from insurance firms . . . and from persons who were clients of said defendant. . . ." If the direct examination by the government had the effect of accusing Medansky of cheating his clients, as he argues, that effect was clearly within the purview of the indict-

6. In *Brown* the appellant argued that to give an *Allen* charge rather than to declare a jury hung deprived him of a mistrial which would have safeguarded his liberty. The decision focused on the questions of when an *Allen* charge was permissible and what form it ought to take. An assumption underlying the decision was that the instruction should not be given automatically whenever a jury seemed to be deadlocked, but only after the trial court, in its discretion, determined the instruction would help the jury reach a verdict. This court's recent decision in United States v. Silvern, 484 F.2d 879 (1973), does not require the use of the modified *Allen* charge approved there.

ment. Furthermore Medansky testified on direct examination that his fee was one-third of each settlement.

█ The district court, upon introduction by the government of a portion of a State Farm Insurance Company file relevant to Count IV of the indictment, admitted a memorandum from an adjuster's supervisor to an adjuster, to "work something out" to reduce the damages. The document further contains the following opinion of the supervisor: "I think . . . this attorney seems to be trying to build it [the accident] all out of proportion by keeping the man out of work for three weeks." Medansky claims prejudice because the opinion expressed in the memorandum was offered to prove the truth of a portion of the indictment, and invaded the right of the jury to decide an ultimate issue arising from the charge in the indictment that it was a part of the scheme that Medansky and Becker "would and did cause clients of Melvin L. Medansky to absent themselves from employment to increase their alleged damages."

The record does not support Medansky's argument that the evidence was offered to prove the truth of the matter asserted. The document admitted into evidence by the court was introduced to prove the communication of information within the insurance company and not to prove the truth of paragraph ten of the indictment. The evidence was introduced to prove a relevant material fact, i. e., the determination by the company to pay the claim. United States v. Wyatt, 437 F.2d 1168, 1170 (7th Cir. 1971), is totally inapposite. There the police report admitted was "[t]he only direct evidence offered to prove the automobile in question was . . . stolen . . . ."

Medansky also claims that under 28 U.S.C. § 1732 the admission of the memorandum was error. The evidence established the memorandum was a writing made in the regular course of the insurance business, which carried with it sufficient trustworthiness to justify admissibility.[7]

We disagree with Medansky that the trial court exceeded the bounds of impartiality by excessive participation in the interrogation of witnesses and by interjecting comments "in a tone [of voice] which left no doubt . . . that the Court . . . disbelieved the defendant . . . ." Medansky relies primarily on United States v. Carmel, 267 F.2d 345, 350 (7th Cir. 1959), and United States v. Dellinger, 472 F.2d 340, 386–387 (7th Cir. 1972). He argues that the "cumulative effect" of the trial judge's "questions . . . comments, remarks and statements" taken as a whole are so highly prejudicial that we must reverse.

█ We have read the record to determine if the trial judge's actions were in performance of his duty to oversee the presentation of evidence and generally supervise the proper conduct of the trial, or whether his actions overstepped the bounds of propriety. The record shows that the conduct of the trial judge here was not "deprecatory" or "antagonistic," nor was the challenged type of conduct "evident in the record from the very beginning." United States v. Dellinger, 472 F.2d 340, 386 (7th Cir. 1972). Moreover, this was not a "close case" at the second trial, as were United States v. Hill, 332 F.2d 105 (7th Cir. 1964), and United States v. Carmel, 267 F.2d 345 (7th Cir. 1959).

The judge questioned Dr. Becker with respect to injuries of certain clients of Medansky, who had been X-rayed by a Dr. Gerber. He was clearly attempting to resolve ambiguity in Dr. Gerber's conclusion that: "No. 1, prominent transverse process of C–7, simulating

---

7. Although not yet effective, Proposed Rule of Evidence 803(6) would allow the admission of a document similar to the one at issue here. Moore's Federal Practice, Proposed Rules of Evidence 122 (Temp.Pamph. 1973); see Advisory Committee's Note, id. at 129–32.

cervical ribs. No. 2, no recent fractures are demonstrated in the cervical areas, but soft tissue injury should be considered." The meaning of the conclusion, as well as Dr. Becker's testimony with respect thereto, was clearly ambiguous and remained so even after questions by the government. We think the court acted in the best interests of the jury, Medansky, and the government, as well as the court, and properly intended to clarify the issue. United States v. Nowak, 448 F.2d 134, 140 (7th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972).[8] And there is no merit in the claim that the "judge undertook to contradict Mr. Medansky's testimony [contrary to Becker's] point by point . . . ." Absent a recording of the trial, we are unable to appraise the alleged prejudicial "tone" of voice used by the trial court.

We find no reversible error in the claimed "highly prejudicial, improper government argument to [the] jury . . . ." Three grounds are stated: (1) the prosecutor argued that if the jury chose to believe appellant they must disbelieve all other witnesses; (2) he said that in effect the jury as insured persons had been defrauded by appellant; and (3) he referred to accident photographs that appellant claimed to have and said: "I will bet you ten to one . . . there were not any."

■ Medansky contends that the prosecutor's "all or nothing" argument improperly "shifted the burden of proof to the defendant." In United States v. Dichiarinte, 385 F.2d 333, 340 (7th Cir. 1967), this court said a similar argument ought to be balanced by an instruction reminding the jury that it was free to consider the theory of innocence offered by the defense. While here the district court did not expressly tell the jury it was free to consider Medansky's

theory of innocence, the instructions are implicit with that idea. And there is no basis for criticism of the instruction that the jury must accept either the evidence favorable to the government or that favorable to Medansky. This did not invade the jury's freedom to consider Medansky's theory of innocence, i. e., that Becker lied. The theory of innocence here was based on the argument that Becker was not worthy of belief even under oath, that his testimony was "incredible," that he lied on the stand and that the other "clients" who testified were "pawns" of Becker or testifying inconsistently with reality because of the "terrifying" fear of the government they felt upon entering the United States Courthouse. We think Medansky essentially asked the jury to accept the "all or nothing" view. In any event, the court's instructions adequately complied with our admonition in *Dichiarinte*.

■ The prosecutor did not say that Medansky was "in effect" defrauding the jury. He said: "Mr. Medansky not only now was cheating everybody who has to pay for automobile insurance, . . . the companies, . . . [and] his clients. . . . Now he was cheating . . . Dr. Becker." There was ample evidence that exaggerated claims ultimately resulted in higher insurance rates, and the reference to Becker was an attempt to characterize him as comparatively less culpable than Medansky.

Finally, with respect to the photographs, Medansky offered to produce them as evidence at trial but the court refused to admit them because the government had failed to prove a part of the indictment which charged that Medansky submitted false property damage bills. Instead the court offered to strike that portion of the indictment, finding "no probative relationship between the

---

8. A similar incident occurred after Becker testified that an X-ray found: "Reduction of physiologic cervical lordosis consistent with posture of spasm. No evidence of traumatic bony pathology or dislocation. Normal findings in the lumbosacral and sacroiliac regions."

**816**

picture of a bent-up automobile and . . . injuries of the passenger." After the prosecutor referred to the absence of photographs in closing argument, the court offered Medansky the opportunity to use them in his closing argument. We see no reversible error in the prosecutor's argument.

The judge, shortly after the jury retired, entered the jury room and, after each attorney expressed "no objection," told the jury, in response to the jury's request, that there was no transcript and that even if there had been it could not be given to the jury which had to rely upon its recollection of the evidence. Three months after the trial this court granted Medansky's motion for remand for a hearing limited to making a record for appeal regarding the district judge's action. The record of the hearing, with testimony taken from the judge and jurors, shows that while the judge was with the jury, a juror spoke up in response to the judge's statement that there was no transcript and asked what counsel was reading from when they were trying to impeach witnesses. The judge told the jury that what counsel were using were transcripts from the first trial and should not concern the jury in their deliberations.

Even though the incident did not seriously concern Medansky until three months after his conviction, a hearing was held, to develop all the pertinent facts and circumstances. We are not persuaded that the district judge's conduct was prejudicial to Medansky so as to deprive him of his Sixth Amendment right to a jury trial or to violate Rule 43 in the light of the harmless error rule. 52(a) F.R.Cr.P. *See* United States v. Arriagada, 451 F.2d 487, 488 (4th Cir. 1971), citing Judge L. Hand in United States v. Compagna, 146 F.2d 524, 528 (2nd Cir. 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422.

For the reasons given, the judgment of conviction is affirmed.