See also 168 Ill.App.3d 30, 118 Ill.Dec. 736, 522 N.E.2d 191.

Gregory ESCOBAR, Petitioner–
Appellant,

v.

Michael O'LEARY, Warden of Stateville Penitentiary, and Neil Hartigan, Attorney General of the State of Illinois, Respondents–Appellees.

No. 90–1860.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1991.

Decided Sept. 10, 1991.

David C. Thomas (argued), Legal Services Center, Chicago, Ill., for petitioner-appellant.

Marcia L. Friedl, Asst. Atty. Gen. (argued), Chicago, Ill., for respondents-appellees.

Before CUMMINGS, WOOD, Jr. and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

In this habeas case, we must decide whether petitioner Gregory Escobar's Fifth Amendment right to be free from double jeopardy has been violated. The state court trial judge *sua sponte* declared a mistrial during Escobar's first trial and Escobar was subsequently re-tried and convicted. We affirm the district court's denial of the writ.

## BACKGROUND

Rudy Lozano, a Hispanic union organizer and unsuccessful aldermanic candidate from the 22nd Ward in Chicago, was mur- dered on June 8, 1983, in his home as he dressed to go out for the day. The police originally suspected Ken Fuentes. When the police took Fuentes into custody for questioning on July 1, 1983, Fuentes gave them his handgun, which proved to be the gun used to kill Lozano. Fuentes originally told the police that the gun was in his possession on the day Lozano was shot. After learning that he was a suspect in the murder case, Fuentes remembered that he had given his gun to his cousin, Alfredo Olvera, the day before the shooting. The police took Olvera into custody, and Olvera divulged that he in turn had given the gun to petitioner Escobar, another of Fuentes' cousins, the night before Lozano was murdered.

Escobar was taken into custody at 6 P.M. on the evening of July 2, 1983. After advising him of his *Miranda* rights, the police interrogated him, on and off, through the night. Initially Escobar denied murdering Lozano, but he confessed in the middle of the night after Fuentes and Olvera, who were being held in the same station, were brought in to confront him. The police took Escobar's statement the next morning. Escobar stated that on the night before the killing, Olvera made an offer of $5,000 to any of his friends who would kill Lozano. Olvera, according to Escobar's statement, had a vendetta against Lozano because of his failure to pay a $7,000 drug debt. Escobar stated that he obtained Fuentes' gun from Olvera the night he made his offer. The next morning Escobar bicycled to Lozano's house and shot him.

Escobar's trial commenced on April 5, 1984, before Judge James M. Bailey in the Circuit Court of Cook County. The prosecution's main witnesses included the police officers who had investigated the case and taken Escobar's confession, and Ken Fuentes, who testified that he had given his gun to Olvera the day before the murder. Olvera did not testify. Escobar's confession was read into evidence near the close of the prosecution's case. After the prosecution rested, Escobar testified. He alleged that his confession had been

coerced. Defense counsel stressed that there were no eyewitnesses to the crime and that Escobar's fingerprints were not found on the scene. Escobar's theory was that Olvera or Fuentes had committed the crime.

The jury began deliberating immediately after lunch on April 10, following three and a half days of trial. Late in the afternoon, the jury sent a note to the trial judge asking if they could consider a written statement made by Olvera on July 6, 1983. This statement had not been admitted into evidence. When the judge examined the materials that had been brought into the jury room, he discovered that the government's "street files" had gone back with the jury. These files contained inadmissible evidence such as polygraph examination reports, gang photographs, police reports, and newspaper reports about the trial. They were contained in a cart labelled "GANG CRIMES" on both sides. When asked how much of the street file had been seen by the jury, the foreman responded that the jury had gone through "just about all of it" (Tr. 819).

After sending the foreman back to the jury room, the judge asked counsel for input. Defense counsel responded, "We'll just have to proceed. We don't want to jeopardize our position" (Tr. 821). The judge then called out the jury, explained that the documents in the street file were to be disregarded, and questioned them about their ability to reach an impartial verdict. The jurors responded collectively that they could do so. The judge allowed the jury to continue deliberating. The jury was sequestered the evening of April 10, deliberated all day April 11, and was sequestered again that night.

The following morning, April 12, at 10 A.M., the jury sent a note to the judge stating, "We would like to come back into court. We cannot reach a unanimous verdict" (Tr. 833). The judge called the jury into the courtroom and asked the foreman if the jurors were deadlocked and if they would be able to reach a verdict. The foreman responded "no" to each question (Tr. 833). At that point the judge sent the jury back to the jury room and asked the attorneys for their advice. Defense counsel asked for a *Prim* instruction, the Illinois state version of a "dynamite" charge urging the jury to reach a verdict. *People v. Prim*, 53 Ill.2d 62, 74–76, 289 N.E.2d 601, 608–610 (1972), certiorari denied, 412 U.S. 918, 93 S.Ct. 2731, 37 L.Ed.2d 144. The judge declared, "We're wasting our time" and stated that "in light of what went on, what went back to the jury room and everything else, I'm going to declare a mistrial" (Tr. 834). He then called out the jury and discharged the jury members.

A week later Escobar submitted a motion to dismiss the case in which he argued that a second trial would violate double jeopardy principles. When the motion was argued on April 24, he contended that because the mistrial had been precipitated by prosecutorial overreaching, retrial was prohibited. The motion was denied.

The case was re-tried by the same judge but before another jury beginning May 8. The evidence was much the same, except that the defendant rested without testifying or calling anyone to testify on his behalf. The jury convicted him after a half day of deliberations and the judge sentenced him to 40 years in prison.

On direct appeal, the Appellate Court of Illinois, First Judicial District, rejected Escobar's double jeopardy claim. It found that Escobar had impliedly consented to the mistrial by failing to object adequately to the mistrial declaration and that prosecutorial overreaching had not prompted the mistrial. The court rejected the other evidentiary and sufficiency challenges presented. *People v. Escobar*, 168 Ill. App.3d 30, 118 Ill.Dec. 736, 522 N.E.2d 191 (1st Dist.1988). After filing an unsuccessful Petition for Leave to Appeal to the Illinois Supreme Court, see *People v. Escobar*, 122 Ill.2d 583, 125 Ill.Dec. 226, 530 N.E.2d 254 (1988), Escobar petitioned for a writ of *habeas corpus* in federal district court. The district judge denied the writ because he agreed that Escobar had impliedly consented to re-trial. The judge held in addition that regardless of defendant's consent, manifest necessity existed for the

mistrial. The judge rejected the only other argument pursued by Escobar in his habeas petition, that the introduction of polygraph evidence at Escobar's second trial violated Escobar's due process rights. This appeal followed.

## ANALYSIS

### A. Double Jeopardy

#### 1. *Implied Consent*

 The Double Jeopardy Clause of the Fifth Amendment[1] is the source of the general principle that "the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717. But because the defendant's interest in finality must be balanced against "the public's interest in fair trials," it has long been the case that not all reprosecutions are barred. *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974. Two rules govern the permissibility of re-prosecution after a mistrial. These rules are organized around the issue of consent.[2] If the defense consents to a mistrial, re-trial is permitted. *United States v. Tateo*, 377 U.S. 463, 467, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448. There is an exception to this rule for cases in which prosecutorial misconduct occurs and the misconduct was "intended to 'goad' the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416. If, on the other hand, a mistrial is declared over defendant's objection, re-trial is barred. *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543. For this second rule there is also an exception for cases in which the mistrial was justified by "manifest necessity." *Arizona v. Washington*, 434 U.S. at 505, 98 S.Ct. at 830. Where manifest necessity for a mistrial exists, in the classic case because of jury

deadlock, see *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), it matters not whether defendant objected to the mistrial. The defendant can be re-tried.

The district court on habeas review and the Illinois appellate court on direct review each held that Escobar's re-trial was permissible because he had impliedly consented to the mistrial. See *Camden v. Circuit Court of Second Judicial Circuit*, 892 F.2d 610, 614 (7th Cir.1989) (implied consent has the same effect as express consent and vitiates any double jeopardy bar to re-trial). Both courts found that Escobar's objection to the mistrial was inadequate because he had failed explicitly to raise double jeopardy concerns when the judge *sua sponte* threatened to discharge the jury. See *Escobar*, 168 Ill.App.3d at 38–39, 118 Ill.Dec. at 741, 522 N.E.2d at 196 (rejecting Escobar's contention that he made "a timely objection, on double jeopardy grounds"), certiorari denied, —— U.S. ——, 110 S.Ct. 1954, 109 L.Ed.2d 316; *Escobar v. O'Leary*, No. 89 C 2127, Mem. Op. at 6, 1990 WL 37241 (N.D.Ill. March 16, 1990) (defense counsel "failed to raise any double jeopardy concerns" during mistrial discussions). Neither court believed that Escobar's request for the *Prim* instruction adequately advised Judge Bailey of his opposition to re-trial. Finally, neither court found any evidence that the street files had reached the jury room because of prosecutorial overreaching, meaning that re-trial could not be barred on that ground.

 We believe that the district court and the Illinois appellate court employed an overly broad definition of consent in holding that Escobar impliedly consented to the mistrial declaration. The Supreme Court has never required that an objection to mistrial contain an explicit reference to "double jeopardy" or "re-trial" to preserve

---

**1.** "No person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb * * *." U.S. Const.Amend. V. The double jeopardy clause of the Fifth Amendment applies to states through the due process clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707.

**2.** This notion is distinct from that of waiver. A defendant can forfeit double jeopardy rights without making a knowing, voluntary, and intelligent waiver of those rights. See *United States v. Dinitz*, 424 U.S. 600, 609 n. 11, 96 S.Ct. 1075, 1080 n. 11, 47 L.Ed.2d 267.

a defendant's double jeopardy rights.[3] Neither has this Court ever imposed such a requirement. When the possibility of mistrial is raised, defendant's obligation is to indicate "whether [he or she] wants a verdict." *United States v. Buljubasic,* 808 F.2d 1260 (7th Cir.1987), certiorari denied, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31. As long as the defendant's desire that the first jury continue deliberating is clear, there is no additional obligation to broach the topic of re-trial.

█ An objection to re-trial is implicit within the objection to mistrial, making separate objections unnecessary. We have held that if defendant fails utterly to object when the judge declares an intention to end jury deliberations, it is reasonable to infer that he or she is indifferent to being re-tried. Thus the re-trial of a defendant who fails to object to mistrial does not offend the double jeopardy clause. See, *e.g., Buljubasic,* 808 F.2d at 1266 (defendant fails to make contemporaneous objection to mistrial declaration and had been himself moving for mistrial throughout proceedings); *Camden,* 892 F.2d at 616–617 (defendant fails "to object in any way to trial court's mistrial declaration" and participates in post-trial conferences regarding preparations for re-trial). However, when the defendant, instead of standing silent, protests the dismissal of the first jury, he or she is expressing a preference for a verdict at the first trial and opposition to exposure to a second trial. Indicating a desire to proceed does not forfeit double jeopardy rights, but instead invokes the essential right conferred by the Double Jeopardy Clause, the defendant's right to "retain[ ] control over the course to be followed" even when "error has substantially tainted the initial proceeding," *Kennedy,* 456 U.S. at 683, 102 S.Ct. at 2093 (Stevens, J., concurring), and to obtain a favorable verdict at the first trial, if possible. See *Hunter,* 336 U.S. at 689, 69 S.Ct. at 837. Thus an inference of consent to re-trial cannot be drawn from an objection to mistrial.

The state argues that judges deserve explicit notice of a possible violation of defendant's Double Jeopardy rights and that requiring less will encourage defendants to sandbag trial judges. We reject the contention that competent trial judges are somehow incapable of recognizing that a mistrial objection has double jeopardy implications, absent guidance from counsel. The obvious questions flowing from a defendant's objection to mistrial are when and under what circumstances a defendant might be re-tried. A defense attorney can do no harm by calling a judge's attention to double jeopardy issues when mistrial is imminent, but we need not command that judges be given extra assistance on this point. Moreover, sandbagging is not a concern here. Sandbagging occurs when a defendant raises an objection not made at trial, thereby depriving the trial judge of the opportunity to avoid making the mistake of which defendant later complains or to create a record on the issue. *Camden,* 892 F.2d at 620 (Posner, J., dissenting). When a defendant objects to a mistrial, the judge is given the opportunity to correct the relevant mistake, the discharging of the first jury. Moreover, the judge has the opportunity to make the relevant record regarding the appropriateness of re-trial. The only information needed by appellate courts on direct and habeas review to assess the merits of a double jeopardy claim consists of the reasons for the declaration of mistrial.

Escobar made the objection necessary to preserve his double jeopardy rights. He objected with sufficient clarity to the discharge of the first jury by repeatedly requesting more jury deliberations after the possibility of mistrial initially arose. Immediately after Judge Bailey discovered that the jurors had been reading Olvera's written statement and that the prosecution's street files had gone back with the jury, defense counsel asked that the jury be allowed to proceed so as not to jeopardize Escobar's position. Escobar's lawyers believed that the verdict would be favor-

---

**3.** The Supreme Court has never squarely held that re-trial is permissible following a defen-

dant's implied consent to mistrial.

able in spite of the possibility of bias. Later the same day, April 10, when the judge began making arrangements to sequester the jury for the night, defense counsel asked that the jurors be allowed to deliberate "a couple more hours" (Tr. 824). The next day, the judge explicitly raised the possibility that the jury might return a tainted guilty verdict. Defense counsel reiterated, "I have no problem with them being allowed to deliberate at all" (Tr. 830). During the last day of deliberations, when the jury indicated that it was deadlocked, defense counsel asked that a *Prim* instruction be given and suggested that a hearing be held to explore that possibility. At the point in time when the judge declared the mistrial, it could not have been more apparent that he was doing so over the objection of defense counsel and without defendant's consent.

■ We conclude that Escobar's unequivocal expression of his desire to proceed to verdict in the first trial was sufficient to dispel any implication that he consented to the mistrial or waived his double jeopardy objection. The remaining question is whether the mistrial was nevertheless properly declared.

## 2. *Manifest Necessity*

■ The doctrine of manifest necessity allows a court to declare a mistrial if a "scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557. A trial court's determination that there was manifest necessity to declare a mistrial warrants special respect, whether the need for mistrial is rooted in jury deadlock, *Washington,* 434 U.S. at 510, 98 S.Ct. at 832 ("trial judge's decision to declare a mistrial when he considers the jury deadlocked is * * * accorded great deference"), or jury bias, *id.* at 511, 98 S.Ct. at 833 ("we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected" by impropriety). Finally, the trial judge need not make an

explicit finding of "manifest necessity" before declaring a mistrial. So long as "the record provides sufficient justification for the state-court ruling," *id.* at 517, 98 S.Ct. at 836, the ruling is not constitutionally defective.

Escobar focuses on the events occurring immediately prior to the declaration of mistrial, and in particular on Judge Bailey's terse comment that further deliberations would be "a waste of time," in order to characterize Judge Bailey's action as a precipitate one. Escobar complains that there was no consideration given to continuing deliberations and that Judge Bailey's premature intervention cut off Escobar's chance of obtaining a favorable verdict from the first jury.

■ The record of the three-day span of deliberations shows that Judge Bailey's decision was cautious and reasoned. The judge did not rush headlong to declare a mistrial, but in fact ordered the jury to keep deliberating several times after mistrial first seemed a possibility. The impartiality of the jury was threatened on the first day of deliberations when the judge discovered the jury in the process of reading Olvera's inadmissible statement to the police, a statement that clearly implicated Escobar. The judge gave both sides an opportunity to express their opinions on how best to proceed. When Escobar's attorneys indicated they wanted further deliberations, the judge polled the jury about their ability to remain neutral and then allowed further deliberations. The next day, the judge expressed his concern that a tainted guilty verdict might be returned, and warned the lawyers that the jury would again have to be polled on the question of impartiality if defendant was convicted. Nonetheless the jury was allowed to deliberate all day, because Judge Bailey thought it "fair enough to the defendant to let it go" (Tr. 830). On the third day of deliberations, the jury sent a note that it was unable to come to a verdict. It was only after this element of jury deadlock further complicated the case that the judge thought additional deliberations would be a "waste of time." He stated, "another jury

will have to decide [the case]," (Tr. 834) and declared a mistrial.

Judge Bailey acted well within his discretion in declaring a mistrial. The judge indicated that a mistrial was necessary "in light of what went on, what went back to the jury room and everything else" (Tr. 834). The possibility of jury bias against the defendant as a result of the jury's exposure to the street files properly concerned the judge, and could itself support a finding of "manifest necessity" for a mistrial. See *United States v. Cyphers*, 553 F.2d 1064, 1068 (7th Cir.1977) (probability that guilty verdict would be reversed on appeal because of jury bias can be basis for judge's decision to order new trial).

■■■■■ The jury deadlock that developed provided another permissible reason to declare a mistrial. The factors to be analyzed to determine if there was manifest necessity for a mistrial in a case of jury deadlock include: a jury's own statement that it cannot agree, the length of deliberations, the length of trial, the complexity of issues presented to the jury, the jury's communications to the judge, and the impact that further, forced deliberations might have on the verdict. *United States v. Byrski*, 854 F.2d 955, 961 (7th Cir.1988). The first factor is the most critical. *Id*. Considered in the context of this case, these factors support Judge Bailey's declaration of the mistrial. The jury stated its inability to reach a verdict, both in a note to the judge and through its foreman when the jury was called into the courtroom.[4] At the time they announced the deadlock, the jurors had deliberated for three days and had been sequestered two nights to consider evidence presented in a three and a half day trial posing relatively

simple issues. See *United States v. See*, 505 F.2d 845, 852 (9th Cir.1974) (not an abuse of discretion for trial judge to declare mistrial after ten hours of deliberation after three and a half days), certiorari denied *sub nom. Gordon v. United States*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673. In these circumstances, it was reasonable for the judge to believe the jury's pronouncement of deadlock and to conclude that further deliberations would be either pointless or coercive.[5]

In sum, Judge Bailey's actions cannot "fairly [be] described as erratic," *Illinois v. Somerville*, 410 U.S. 458, 469, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425, as is typically the case when an appellate court finds that a mistrial declared by the trial judge cannot be supported by manifest necessity. See, *e.g., Jorn*, 400 U.S. at 470, 91 S.Ct. at 547 (judge *sua sponte* discharges jury after refusing to believe prosecutor's representation that government witnesses in tax case had been advised of their right not to incriminate themselves, without exploring possibility of continuing trial until witnesses could consult with their own attorneys); *Lovinger v. Circuit Court of 19th Judicial District*, 845 F.2d 739, 746 (7th Cir.1988) (judge fails to consider any alternative short of mistrial to deal with prosecution's failure to comply with pre-trial orders and possible misconduct during trial, and declares mistrial on own initiative without allowing either party an opportunity to comment or object). Instead, this judge responded ably to the developments during deliberations, and was solicitous to Escobar's right to obtain a verdict at the first trial, if possible. The record supports the determination implicit in his declaration of a mistrial that, by the third day of delibera-

---

4. Escobar contends a mistrial cannot be declared unless the trial judge polls the jurors individually to assure himself that the jury was in fact deadlocked. While it is preferable that a jury be polled before dismissal, a trial judge is not under an obligation to conduct such a poll. *United States v. Medansky*, 486 F.2d 807, 812 (7th Cir.1973) (allowing re-trial where the court questioned the foreperson but did not poll the jury on issue of deadlock), certiorari denied, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886.

5. Contrary to Escobar's assertion, Judge Bailey was not obligated prior to declaring a mistrial to read the *Prim* instruction urging the jury to try once more to arrive at a verdict. This Court has held that it is within a judge's discretion to refuse to give a so-called "dynamite" charge. The judge is in the best position to decide whether such a jury instruction would be helpful or instead would serve merely to coerce the jury into reaching a verdict it otherwise would not have reached. See *Medansky*, 486 F.2d at 813.

tions, the "public's interest in fair trials designed to end in just judgments," *Hunter*, 336 U.S. at 689, 69 S.Ct. at 837, outweighed Escobar's right to have his trial concluded before his first jury, and thus that Escobar would have to be re-tried.

In arriving at our conclusion, we necessarily reject Escobar's allegations of judicial and prosecutorial overreaching. Escobar contends that Judge Bailey declared a mistrial because he feared that Escobar would be acquitted. Escobar believes it was because the judge was prejudiced that his actions were aberrant and antagonistic toward him. He argues that it was the judge who initially planted the idea of jury deadlock in the jurors' minds. With respect to the prosecutors, he contends that they intended to send the street files into the jury room. According to Escobar, the judge and the prosecutors knew the case was going badly for the prosecution. In support of a motion for acquittal made to Judge Bailey after his second trial, Escobar submitted an affidavit from the foreman of the first jury stating that the jurors were deadlocked eleven to one in his favor before being dismissed.

■ As has been explained, the record simply does not support any finding that the judge was hostile to the defendant's interests. Judge Bailey afforded Escobar the opportunity to obtain a favorable verdict, even though allowing continued deliberations after the discovery of the street files posed a real threat that the jury would return a tainted guilty verdict. Escobar's contention that the judge himself tainted the jury by suggesting deadlock is far-fetched. The judge questioned the jurors several times during the three days of deliberations about their progress. His concern was merely arranging for sequestration, and he stated clearly to the jury that his questions were "just for the purposes of scheduling" (Tr. 827). It is highly un-

likely that the jury felt coerced by the interchanges.[6] There is an absence of any hint in the record that Judge Bailey harbored the bad motives Escobar attributes to him.

■ Both Judge Bailey, in ruling on a post-trial motion for acquittal, and the Illinois appellate court on direct review of Escobar's conviction, rejected the suggestion that the prosecutors intentionally sent the street files into the jury room. That finding is supported by the record. At the time the street files were discovered to be in the jury room, all parties believed the mistake to be inadvertent. Defense counsel stated that he believed the error to be inadvertent (Tr. 1571–1572). There was no evidence that the prosecution intended to provoke a mistrial. Moreover, as Judge Bailey pointed out, there was much in the cart that was as damaging to the prosecution as to the defense. Had the prosecution wanted to provoke Escobar into requesting a mistrial, sending a cart containing both favorable and unfavorable evidence into the jury room would have been a dubious way to accomplish the goal.

■ The eleven to one split amongst the jurors at the time the mistrial was declared proves little that can aid Escobar. At most it establishes that Escobar was correct in his assessment of the case. His decision to keep asking for further deliberations after the discovery of the street files in the jury room was astute, for he was close to winning an acquittal. However, the fact that the jury was split in favor of acquittal cannot establish that the judge and prosecutor believed this to be the case. More importantly, Escobar received every opportunity to capitalize on his hunch that the trial was going well for him. When Escobar's attorneys requested more deliberations, the judge repeatedly gave the jury the opportunity to return the not guilty verdict. On the third day, however,

---

**6.** The judge stated on the second day of deliberations, "They have to reach a verdict by six o'clock" (Tr. 831). Escobar interprets this statement to mean that the judge wanted a guilty verdict by six o'clock or would declare a mistrial, but the statement more reasonably is read as the judge's opinion that the jury would not find it necessary to deliberate much longer, given the nature of the evidence presented. The rest of the discussion between the judge and the lawyers indicates that the judge was not opposed to letting the jurors deliberate the next morning, and in fact they did deliberate the morning of April 12.

when the jury declared itself deadlocked, the judge accepted their representation, and for the reasons already discussed, this acceptance was permissible. A mistrial is just as necessary for a jury that reaches an impasse at a vote of eleven to one as one that deadlocks at some other, more balanced vote.

We conclude that it was permissible to re-try Escobar. Because we interpret the law relevant to implied consent differently than had the Illinois Supreme Court or the district court below, we cannot agree that Escobar impliedly consented to the re-trial. However, the mistrial was required by manifest necessity, and thus re-trial was permissible. The writ sought cannot be granted on grounds of double jeopardy.

B. Polygraph Evidence

■ In addition to his double jeopardy claim, Escobar renews an argument he made below and on direct appeal. He claims he is entitled to a new trial because Judge Bailey wrongly admitted polygraph evidence against him. At Escobar's second trial, Fuentes responded to a question posed by the prosecutor in part by mentioning that he had taken a lie detector test. The defense attorney had been questioning Fuentes closely about how he happened to remember while in police custody that he had lent his gun to Escobar. When the prosecutor attempted to rehabilitate his witness, the following exchange occurred:

Q: Now, explain to the jurors what it was that triggered your memory so that you remembered you did not have that weapon?

A: [Fuentes] Well, it must have been around 12:00 o'clock on Saturday that [the police] asked me if I wanted to take a lie detector test and I said I would. So we took the lie detector test on the way back the officer was asking me are you sure that you had the gun that day and I said no, I am not really sure what happened with that gun that day and when we got back to the station one of the police officers said something about some candy apples which was then when I remembered going to Old Town and coming back and getting the gun from [Olvera] and two days prior to that of giving it to him.

(Tr. 1165). In Illinois, polygraph evidence is not admissible. *People v. Baynes*, 88 Ill.2d 225, 244, 58 Ill.Dec. 819, 828, 430 N.E.2d 1070, 1079 (1981). The prosecutor repeated Fuentes' testimony in his closing argument (Tr. 1466).[7] Escobar argues that Fuentes' comment invited the jury to come to the conclusion that Fuentes had passed a lie detector test and thus that Escobar must be the guilty party. He believes that his due process rights were violated as a result of the state court's evidentiary error.

■ Habeas relief is only appropriate when a petitioner is being held in violation of the Constitution or federal law. 28 U.S.C. § 2254(a). Violations of state evidentiary rules "may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Searcy v. Greer*, 768 F.2d 906, 910 (7th Cir.1985), certiorari denied, 474 U.S. 996, 106 S.Ct. 412, 88 L.Ed.2d 363.

■ Escobar's trial was fundamentally fair. Fuentes' comment about his polygraph test was regrettable and the prosecutor compounded the possibility of prejudice. But Fuentes' comment was a passing one and neither Fuentes nor the prosecutor divulged the results of Fuentes' test. Moreover, the strength of the other evidence admitted against Escobar rendered harmless any error. Most notably the state introduced Escobar's confession. Escobar had recanted his statement at the first trial on grounds that it had been coerced, but let it stand unimpeached at the second. Because the jury undoubtedly convicted Escobar on the basis of this and other properly introduced evidence, and not because of the stray remarks made by Fuentes and the prosecutor, Escobar's trial

7. The prosecutor's statement was: "And as Kenny [Fuentes] told you, after that the police told him, after he had taken that lie detector test, that are you sure you didn't have the weapon that day? Are you sure you didn't have the weapon on the day? * * * That was what was in his mind made him recall that he had given the gun to Olvera" (Tr. 1466).

was not fundamentally unfair and consequently his due process rights were not violated.

## CONCLUSION

For the foregoing reasons, Escobar's petition for a writ of habeas corpus is denied.